CITY OF SIOUX CITY, appellee, v. WILLIAM G. TOTT, appellant.

No. 48273.

(Reported in 60 N.W.2d 510)

OCTOBER 20, 1953.

 █ 

George A. Gorder, of Sioux City, for appellant.

Thomas J. Griffin, corporation counsel, and William A. Shuminsky, city attorney, both of Sioux City, for appellee.

MULRONEY, J.—The main question in this case involves the sufficiency of the evidence to establish a common-law dedication of a road in the City of Sioux City.

The drawing herein will be sufficient to show the claimed road and the surrounding area.

Defendant and his wife own and maintain a nursing home on the north side of Washington Avenue adjacent to Mulberry Street, and in 1948 they purchased the triangular tract (1.247 acres) marked "acreage" on the south side of Washington Avenue, lying northeast of the railroad right-of-way.

The alleged road, shown by the dotted line, commences at the corner of Mulberry Street and Washington Avenue, extends approximately seventy feet to the railroad right-of-way, then goes in a southeasterly direction along the right-of-way approximately three hundred eighty feet to Spaulding Park.

Sometime in the spring of 1949 defendant blocked the road by a cable stretched across the road. Someone cut the cable, and ·in the fall of 1949 defendant placed a large log across the road. The log remained there through most of the winter of 1949 and 1950 but defendant pushed this log out of the way so the

road was passable for a time and then in May of 1950 defendant did some grading on his triangular piece of ground and he left a bank of earth six feet high blocking the roadway.

In July of 1950 the City started this action to enjoin defendant from blocking the road, the petition alleging: "That for many years last past, the plaintiff has maintained and used as a public street a strip of land sixty feet in width [legal description follows]; that said street has been used as an entrance to Spaulding Park. That the continued use of this strip of land has constituted a common-law dedication of same as a street."

The petition goes on to allege that defendant has blocked this street, and the City's general duty to keep it open and to pray for the injunction.

1288

The answer traverses the allegations of the common-law dedication of the strip as a street. The trial court held the evidence sufficient to establish the common-law dedication and decreed that a writ issue restraining defendant from obstructing the described strip "sixty feet in width" abutting and parallel to the railroad right-of-way.

■ I. At the outset it is well to note the City does not claim title to an easement by adverse possession. In one brief point the City now argues that the evidence would support a decree establishing an easement by adverse possession. The claim of title by adverse possession is a statutory action, governed by chapter 564, Code, 1950, where it is expressly provided (section 564.1) that "the fact of adverse possession shall be established by evidence distinct from and independent of its use, and that the party against whom the claim is made had express notice thereof; and these provisions shall apply to public as well as private claims." The answer to the City's adverse possession brief point is that it did not plead it acquired title by adverse possession and the pleading and proof of usage of the strip would not support a decree in the City's favor as an adverse claimant. The trial court did not hold the City was entitled to the strip as adverse claimant. He specifically held the evidence sufficient to establish "a common-law dedication of the strip as a street", so we will confine our discussion to the sufficiency of the evidence to support such dedication.

The record is not long, so before stating the rules of law governing a common-law dedication we will run through the evidence which the City contends sufficient to support the dedication.

The city engineer stated that the matter of this road came to his attention in 1948 when defendant sought vacation of that part of Washington Avenue which runs east from Mulberry Street about half a block to Spaulding Park. It fairly appears the City was willing to grant this vacation if defendant would give the City a deed or easement to the road in question—which proposition was not acceptable to defendant. The city engineer described the road in question, stating: "This particular strip of land, this alleged road, went up over a hill; I would say it

was rather steep, maybe seven or eight per cent, might have been even more; it was all overgrown with shrubbery and grass, except the traveled part; a man used to go back and forth from his house there * * *." He stated "the city blade worked it from time to time", but later he testified there had been no heavy grading on the strip and the blade men had merely told him they had worked that strip. He said: "There hasn't been any use for Spaulding Park on it up to this time only the help going back and forth and the man living in the house. * * * There is only one residence in Spaulding Park, and there are no residences that would be served by this particular strip of land beyond Washington and South Mulberry; there are no grandstands in the park but boys play baseball there; there is no building on Spaulding Park except this residence of Mr. Pranke; I don't know what his arrangements with the city for living there are."

The engineer said the City had a street, Stone Avenue, for access to Spaulding Park on the south but he thought it would be essential for the convenience of the people using the park that there be an opening at both ends.

Mrs. Verlinden owns property just east of defendant fronting on Washington Avenue. She was born about four blocks from this place and has lived in the area most of her sixty years. In the early days Spaulding Park was a farm, where her husband's folks once lived, and she used to go to the farm but usually went by way of Stone Avenue. She was asked if in those days there was a roadway along the railroad tracks across the triangular acreage and she replied: "Well, the roadway never was in one place. It was always rather as they could get in and out better, but they did get in and out that way." She was asked if it was "continuously used" as a roadway and she replied: "I couldn't say it was continuously used. They used to come in and out that way to a certain extent, but I couldn't say it was continuous." On cross-examination she stated: "There never was any particular one spot of road, but it was there most anywhere on the crest of that hill, just as they could get over the best way. There never was a roadway there, that is a defined roadway, not as I ever remember. * * * there never was what you would call a roadway there, they just came in and out of there to a

certain extent, over the crest of that hill, and the only ones that ever did that were the people that lived on that farm; there are no residences beyond that that could be served by it; we never used this, the crest of this hill, in any way; we always went around Stone Avenue, which leads into Spaulding Park; I think there is a bridge there that they can go into part of the park, which is kept up very good leading into the first part off Stone Avenue to the bridge that leads over to it; there would be no difficulty in getting into Spaulding Park over Stone Avenue, it would be a long way to go for them to fix up to the north end of the park; the people who live in the house in the park wouldn't have to cross the railroad tracks if they used Stone Avenue; they have a well-defined road or street that is platted, and kept up by the city when they go on Stone Avenue; this dwelling house is more or less in the center of the park; I couldn't say how much farther it would be from the entrance into Spaulding Park over Stone Avenue to this dwelling house than it would be from the corner of Washington and South Mulberry, there wouldn't be too much difference, no."

The only part of Mrs. Verlinden's testimony, upon which plaintiff bases an argument of dedication is an answer she made to a question as to whether she knew who kept the road in repair. She answered "the Verlinden family used to think the city done a pretty good job of keeping the place open for them." In view of the fact she had earlier said her husband's family had usually used the Stone Avenue approach which she said the city "kept up" it is not clear that she was talking of the road in question.

George Grant, an employee of the city street department since 1922, testified he worked on the slip gang, smoothing roads. He stated: "We used to go with a plow and scraper, from the Correctionville Road [an east-west highway that crosses Mulberry about three blocks north of Washington], clear through this winding road to Stone Avenue * * *." He said this was worked once every three or four years since 1924 or 1925 but at that time he did not know where Spaulding Park was but he remembered there was a place in this road he worked that went alongside some tracks and one place where he would go through a cut over a hill. He did not know where Washington Avenue

came through on the roadway he worked and he said: "I will have to say I don't remember of ever seeing any vehicle on that so-called road and I don't know if I ever had any instructions to go all the way through there."

Eddie Stoltze had farmed an acreage in what is now a part of Spaulding Park for about twenty-five or thirty years, and up until three years before the trial. He said he had a truck garden on both sides of the track east of the triangular acreage. He said there had been a road through the triangular acreage that he used and the road led to this little house, where he lived, which is now in Spaulding Park. He said it was a mud, dirt road and the City and he both worked it during the years he lived there; that "there was a lot of shrubbery, or weeds, or grass growing over this road all the time" when he used it. Here are other excerpts from Mr. Stoltze's testimony: "* * * the only fence was around the Spaulding property; the fence along this road was always open, although I put a gate there about a year to keep the kids out; when I was there gardening it was a private road; if the city was out there with a grader they would come out, otherwise if it got too rough I would ask them to; the public couldn't get through over this road from Mulberry Street to Stone Avenue; they would come up that road and turn around there in the yard or the garden and go back; the last six years you could get to Stone Avenue from the house; it is more or less level from the house to Stone Avenue, and it is an up-and-down road from Mulberry to the house; in rainy or snow season it is hard to keep the road in condition to go over it, I mean the hill road; there is nobody that could be served by the road except the person that had this little house I was living in; I never asked permission to use it; it was there and had been before I came; it was six, eight feet, cut alongside the track, graded in there, probably twenty, twenty-five feet high over the track. * * * I tried to keep a good road there; I kept it so I could use it; the city was there from 1922 to date seven or eight times or more; if the city wouldn't blade it, I did it myself * * *. I had the road posted one year, I put a sign there 'private road' to keep the kids out; as far as I was concerned I always considered this a private road. * * * I put the sign 'private road'

down at the bottom of the hill on Mulberry; it kept the kids out for a while, they tore the sign down."

Robert Sample, a city employee from 1931 to 1940, testified he had worked this road with a blade but he could not remember how often. He said when he was working in that part of town he would level it up. He said they used a 12-foot blade and the road was wider than that but there were no gutters as they did not cut gutters on narrow roads, and there was never any sand or gravel placed on the road. He said there were no cross streets and no residences served by the road except the house in the park.

Mr. Edward Pranke moved to the house in the park in January 1948. He worked at the Swift Packing Company and he paid for his occupancy of the dwelling by cutting the grass in the park with a horse-drawn mower. He personally did not drive over the road more than seven or eight times, because he said his car was broken down most of the time and when he walked he usually walked down the tracks. He said the road was used by some of the Archery Club members and baseball players, but most of them came from the south or Stone Avenue approach. He said the road from the house to Stone Avenue crossed a couple of bridges and one of them went out in 1949 and the other would not hold an oil truck, or hay truck or other machinery, that he wished to come to his dwelling. He testified he cut the cable the defendant placed across the road and that he talked to defendant and later defendant pushed the log out of the roadway. He stated: "I don't know whether the city ever claimed this as a road. As far as I ever knowed it was always used as a road; I don't know whether it was always considered as a private road."

The above completes the testimony introduced by the City to establish its allegation of a common-law dedication of a 60-foot-wide roadway across defendant's land. Defendant's evidence, consisting of the testimony of himself, his wife and his brother, is much the same as plaintiff's testimony. They had all lived in the area many years. Defendant did say that the "private road" sign that Stoltze placed on the tree at the Mulberry Street entrance to the roadway in question remained there for some

twenty-six years and he and his wife both testified the Archery Club members had asked and received permission to use the road. Defendant testified: "I had lived there twenty-six years; the road running to the southeast along the railroad had been used intermittently in that time in favorable weather by the people living in the house in the park; they walked in as often as they rode in; it is only in the last few years anyone has gone into for park purposes."

Defendant's brother who lived with him in the nursing home from 1922 to 1937 said: "This road in question was just a made road, it ran only as far as Mulberry Street; I walked over it many times * * *. I have driven over to the building in the park when I wanted to see Mr. Stoltze, with a car; Mr. Stoltze was the only one who used the road, what I mean some of these relatives maybe would come and visit and would use that road too, and I suppose some business people * * *."

Defendant's wife testified: "As I have seen, the only ones who have used the road in question are just the ones that lived back there in Spaulding Park. During those years Mr. Stoltze and his family were the only ones who used it, and since that time Mr. Pranke and his family; we gave the Archery Club permission to use it * * *."

II. There seems to be no dispute as to the law governing this controversy. A common-law dedication of land for a public purpose is well recognized in law. It is in no sense a *taking* of land for public purpose, for the public, as represented by the municipality, cannot *take* private property for a public purpose without paying for it. Dedication is just what the term signifies. It is the owner's *giving* the right or easement for public use—the devotion to public use by the owner. De Castello v. Cedar Rapids, 171 Iowa 18, 21, 153 N.W. 353, 355; Dugan v. Zurmuehlen, 203 Iowa 1114, 1117–1119, 211 N.W. 986, 988; Culver v. Converse, 207 Iowa 1173, 1175, 224 N.W. 834, 835. In the De Castello case we said: "Private property cannot be taken for public use without first making or providing for compensation. The party may, however, give his land, or an interest in it, to the public use."

1294

The opinions in Dugan v. Zurmuehlen and Culver v. Converse, both supra, contain reviews of, and approved quotations from, most all of our earlier opinions where the rules governing common-law dedications are involved. In the Dugan case we said:

"The primary thought is that the right or title acquired by dedication has its existence in the owner's consent, either actual or implied. The right or title acquired is not viewed as one by adverse possession, predicated on the assertion of title in hostility to that of the record owner. Whatever the nature of the declarations or acts relied upon to create a dedication, it is the universal holding that intention to dedicate (*animus dedicandi*) must exist. * * * The sufficiency of the evidence will depend, in a measure, on the character of the property claimed to be dedicated. [Citing cases] However, a claimed dedication to public use is not to be presumed against the owner of the land, but must be established by acts and declarations of the owner of such a public and deliberate character as makes it generally known, and of no doubtful intention. * * * The proof must be strict, cogent, and convincing, and the acts proved must not be consistent with any other construction than that of dedication * * *. The theory of the law is, where proof of dedication rests upon user, that the essential intention existed at the beginning of the use, and continued through the whole period necessary to evince a conclusive dedication; and the user for the whole time of limitation must necessarily be of right. In other words, it must be something more than a mere license or merely permissive. * * * While the uninterrupted use and enjoyment of land as a road or highway by a limited number of persons for a sufficient length of time may establish a private right of way, it is manifest that no dedication or public easement would arise from such user. In order to acquire a public easement, the user must be by the public at large."

In Culver v. Converse, supra, we said:

"The doctrine announced by our cases is that a dedication of lands for a public highway may not be predicated on anything

short of deliberate, unequivocal, and decisive acts and declarations by the owner, manifesting a positive and unmistakable intention to permanently abandon his property to the specific public use. [Citing cases] * * * In order to constitute a dedication, the evidence must be clear, satisfactory, and convincing, and the acts proved must not be consistent with any other construction than that of dedication; and the same rule applies to the acceptance of the dedication. [Citation] Mere permissive use of a way, no matter how long continued, will not amount to a dedication. The user is presumed to be permissive, and not adverse."

Turning again to the facts in this case which we have set forth in some detail in the forepart of this opinion, we fail to find the evidence to establish a common-law dedication of a public road, sixty feet wide across defendant's acreage. We first look at the character of the property claimed to be dedicated. This triangular acreage contains 1.247 acres. The City's claim of a strip sixty feet wide across this acreage amounts to a claim that some former owner or owners *gave* almost exactly half of the area to the public. Defendant testified he paid taxes on the entire triangular acreage lying northeast of the railroad tracks and he exhibited the tax receipt for such payment.

The first quest is to find evidence indicating the owner's intention to dedicate the strip sixty feet wide as a public road. The burden was upon the City to show this fact by clear and unequivocal testimony. The only owner who testified in this case was the defendant, who bought the property in 1948 and who posted the road as private and later blocked it so no member of the public could use it. We do not know whether the testimony of any former owners of the acreage was available to the City or not. The City relies upon testimony of its acts in blading or smoothing the strip and testimony of user by the public as a road. The question is whether this testimony is sufficient to establish an intention by former owners to give the strip to the public as a road. As stated in Davis v. Town of Bonaparte, 137 Iowa 196, 202, 114 N.W. 896, 898: "The intention of the owner to set apart the lands for the use of the public as a highway—

the *animus dedicandi*—is the fundamental principle, the very life of dedication."

III. There is no testimony that any owner or even any tenant of an owner ever asked the City to drag, blade or grade this strip. It can hardly be argued the City's own acts in smoothing a strip of private property will constitute evidence of the owner's dedication of that property to the public. It might be supporting evidence if there were other evidence of acts of the owner indicating an intention to dedicate or if the owner requested the City to smooth the strip for travel, or if the strip were long used by the general public as a road. Standing alone, as it does in this case, it is no evidence at all of an owner's intention to give his property to the public.

IV. With no testimony of any acts of former owners with respect to this acreage the City necessarily had to rely on proof of user. This does not mean the City is absolved from the burden of showing the former owner's intention to dedicate. It means that the intention is to be shown by acts of a public character. User by the public at large such as is generally known, which is continuous, throughout the whole period of limitation, will establish the owner's intention to dedicate. Dugan v. Zurmuehlen, supra. No such proof is present in this case. Every witness who testified as to user, including all of the City's witnesses, testified the road was for the purpose of serving the house in the park. The occupant of this house and on some occasions those members of the public who had dealings with him did use this road to some extent, but that is not a use by the public at large. There is a distinction between a dedication to the public for a public use and use by one person in his dealings with the public. Bradford v. Fultz, 167 Iowa 686, 149 N.W. 925. Proof of the latter might be sufficient to establish a private right-of-way but no dedication to the public would arise from such user. The proof of user introduced by the City seems to negative the whole idea of any dedication to the public. The City's own witness, Stoltze, who lived in the park house and farmed the area to the east for some twenty-six years was the only witness testifying as to user during the limitation period and he said he put a sign at the road entrance, Private Road.

Defendant testified this sign was there for twenty-six years and when he blocked the road in the spring of 1948, when he bought the property, Stoltze asked and obtained permission to use it until he moved out the following fall.

Mrs. Verlinden's testimony as to usage was of no help to the City in its effort to show dedication by use by the public at large. According to her there never was any defined roadway. She said the persons who lived on the old Spaulding farm just went in and out that way to a "certain extent" and she could not say that use was "continuous." There was no proof of continuous usage by park patrons sufficient to establish use by the general public. The Archery Club members' use was permissive and the baseball players who came by car seldom used this road.

Under the whole record we are convinced the testimony is insufficient to establish any owner's intention to dedicate this strip to the public—the first step in the proof to establish a common-law dedication. It is not established by the evidence of the City's acts of maintenance, and it is not established by the proof of usage. We need not consider the second step, or the evidence necessary to establish the City's acceptance. The cause is reversed for decree dismissing the City's petition.—Reversed.

All JUSTICES concur.