EDITH A. MEEK, SURVIVING JOINT TENANT, APPELLANT, V. JOSEPH
J. GRATZFELD AND SYLVIA E. GRATZFELD ET AL., APPELLEES.

389 N.W.2d 300

Filed June 27, 1986.    No. 85-393.

John Thomas, for appellant.

William J. Klimisch of Goetz, Hirsch & Klimisch, for appellee American State Bank.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

This case arises out of a controversy concerning the sale of a bar and restaurant known as Joe's Steakhouse.

The appellant, Edith A. Meek, and her late husband, Phillip G. Meek, purchased the property in October 1970. In 1975 the Meeks sold the property to the defendants Joseph and Sylvia Gratzfeld on a contract. Under the contract, the Meeks retained

title until the Gratzfelds had made all of the installment payments. The sale included both the real estate and the personal property associated with the business.

To finance part of the downpayment the Gratzfelds obtained a Small Business Administration (SBA) loan from the American State Bank. Because the lenders required that they subordinate their interest in the property, the Meeks executed a mortgage on the property, a standby agreement, and a guaranty to the bank.

The standby agreement was, essentially, a subordination agreement which expressly limited the Meeks' right to enforce or collect their claim under the Gratzfeld contract or to realize upon any collateral securing that claim. The standby agreement provided that the Meeks could assert their rights only with the written consent of the bank or as provided in the SBA authorization and loan agreement. The Meeks were also permitted to realize upon collateral given prior to the Gratzfelds' loan application, except where the lien on the collateral was required by the authorization and loan agreement to be subordinated to the bank's mortgage.

The standby agreement included a provision which granted to Lender *full power, in its uncontrolled discretion and without notice to Standby Creditor* or Secondary Obligors, to deal in any manner with the indebtedness evidenced by the Note and the collateral therefor, including, but without limiting the generality of the foregoing, the following powers:

(a) To modify or otherwise change any terms of all or any part of the loan or the rate of interest thereon (but not to increase the principal amount of the Note, except as provided therein), to grant any extension or renewal thereof and other indulgence with respect thereto, and to *effect any release*, compromise or settlement with respect thereto.

(Emphasis supplied.)

Early in 1981, the Gratzfelds began negotiations to sell the business to the defendant Darla Bierwagen. After receiving the Meeks' permission to sell, the Gratzfelds informed Bierwagen that she should proceed with attempts to obtain a loan.

On or about April 10, 1981, the bank submitted Bierwagen's loan application to the SBA. The SBA denied the loan because it questioned the value of the assets securing the loan and Bierwagen's management abilities.

Bierwagen then sought a reconsideration of her application by contacting the SBA personally. Following an appraisal of the property and an independent evaluation of her management skills, the loan for downpayment was approved. On or about June 25, 1981, the SBA sent the bank an "Authorization and Loan Agreement."

On July 31, 1981, the Meeks, Gratzfelds, and Bierwagen met with Marvin Steffes, senior vice president of the bank, to close the Bierwagen loan. Bierwagen executed and delivered a note to the bank in the principal sum of $46,000. In addition, she pledged the personal property involved by executing and delivering a security agreement and financing statement to the bank. The Meeks signed a standby agreement and a mortgage of the real estate, both in favor of the bank. They did *not* execute a guaranty. The Gratzfelds and Bierwagen also signed the mortgage. The mortgage previously executed by the Meeks was released.

On September 14, 1981, the Meeks and Gratzfelds executed an addition to their purchase agreement, acknowledging the sale to Bierwagen and amending the payment terms. On September 24, 1981, the Meeks, Gratzfelds, and Bierwagen reexecuted the standby agreement of July 31, 1981, to correctly reflect the borrowers involved.

After the loan was closed, Bierwagen took possession of the property and began making payments. She eventually became delinquent in her payments to the Gratzfelds. The Gratzfelds in turn defaulted to the Meeks.

On March 29, 1983, the Gratzfelds executed an assumption agreement with the bank because Bierwagen had threatened to file a petition in bankruptcy. Under this agreement the Gratzfelds assumed Bierwagen's debt to the bank and the SBA. The Gratzfelds also executed a security agreement and financing statement to secure that note. The Gratzfelds also executed a promissory note for $6,776.64, in favor of the bank, and a security agreement to secure the note. An extension

agreement for this latter note was executed on February 6, 1984.

The Gratzfelds subsequently defaulted on their payments to the Meeks and on the two promissory notes to the bank.

On July 16, 1984, the Meeks commenced this action to foreclose on their contract with the Gratzfelds. Phillip G. Meek died on July 30, 1984. The appellant succeeded to his interest in the property as a surviving joint tenant.

In its answer the bank alleged that its mortgage was a first lien on the property and, by cross-petition, sought foreclosure of its mortgage and security agreements. In her reply the appellant denied that the bank's mortgage was a first lien and alleged that any priority had been obtained by the bank's failure to disclose material facts and that any priority was waived because Bierwagen had been released from liability on the note without notice to or the consent of the Meeks.

At the trial the appellant and the bank stipulated that as of March 14, 1985, there was due and owing by the Gratzfelds to the appellant a total of $81,360.05. It was also stipulated that there was due and owing by the Gratzfelds to the bank $53,509.59 on the July 31, 1981, note and $6,143.07 on the March 29, 1983, note.

On May 10, 1985, the court entered judgment, finding generally for the bank on its cross-petition and counterclaims. It was awarded $54,651.87 plus interest and costs, and the mortgage foreclosed. The bank was also found to have a first lien on the personal property pledged to secure the March 29, 1983, note, in the amount of $6,271.32. Edith Meek was found to have a second lien on the real property in the amount of $82,311.95 plus interest and costs, and it was foreclosed. Edith Meek has appealed.

An action to foreclose a real estate mortgage is an action in equity, which we review de novo on appeal. *First Fed. Sav. & Loan Assn. v. Cal-Neb Land Co.*, 219 Neb. 887, 367 N.W.2d 136 (1985). The review is subject to the rule that when the evidence is in conflict, this court considers the fact that the trial court heard the witnesses and accepted one version of the facts over the other. See, *Travelers Indemnity Co. v. Heim*, 218 Neb. 326, 352 N.W.2d 921 (1984); *Schaneman v. Schaneman*, 206

Neb. 113, 291 N.W.2d 412 (1980).

In her first assignment of error the appellant contends that· the bank failed to prove a valid agreement by the Meeks to subordinate their lien to the bank's subsequent mortgage. Specifically, she argues that the July 31, 1981, mortgage and the September 24, 1981, standby agreements do not clearly and unambiguously evidence such an agreement.

Neither the standby agreement nor the mortgage expressly states that the bank will have a "first mortgage." The first paragraph of the standby agreement acknowledges that the · Meeks were owed $84,730.42 under the Gratzfeld purchase agreement. The second paragraph provides:

2. Without the prior written consent of Lender [the bank], Standby Creditor [the Meeks] and the Secondary Obligors will take no action (a) to assert, collect or enforce all, or any part of, the Claim [$84,730.42 owed to Meeks], except amounts which Standby Creditor is permitted to receive and retain pursuant to the Authorization [Bierwagen loan authorization]; or (b) to realize upon any collateral for the Claim, except collateral specified in, and permitted to be realized upon by, the Authorization, and except collateral given prior to the date of the Borrower's [Bierwagen] application for the Loan, provided that no action shall be taken to realize on any collateral, the lien on which Standby Creditor is required by the Authorization to subordinate to the lien of the mortgage securing the Note of Borrower (hereinafter called "Note") executed pursuant to the Authorization.

The mortgage expressly stated that the real estate was "free from all encumbrances except as hereinabove recited . . . ." No other encumbrances were listed in the mortgage.

The appellant testified that in discussions at the July 31, 1981, closing, she and her husband were not informed that the bank or SBA would have a first mortgage. Steffes, the banker, testified that he did not recall specifically saying that the bank would have a first mortgage, "because the mortgage itself speaks for itself." Joseph Gratzfeld testified that priorities were discussed when he contacted the Meeks about selling to Bierwagen and informed them that the priorities would be the

same as when the Gratzfelds purchased the business in 1975, i.e., the bank or SBA would have a first mortgage, the Meeks a second lien, and the Gratzfelds a third. Gratzfeld also testified that priorities were discussed at the July 31, 1981, closing and that the bank or SBA had first priority, the Meeks second, the Gratzfelds third, and Bierwagen fourth.

The appellant also testified that Steffes had, upon her inquiry at the closing, informed her that the standby was "simply an agreement that if Darla folded on her payments or could not make her payments, the mortgage would revert to Joe Gratzfeld not to us [the Meeks], but to Joe Gratzfeld." Joseph Gratzfeld testified that Steffes' response to Meek's question was intended to inform the parties of the priorities and that the bank or SBA had a first mortgage.

The Meeks made no request to see the authorization and loan agreement when they signed the standby agreement and mortgage.

The priority of a mortgage may be changed by agreement of the parties. *Reitz v. Petersen*, 131 Neb. 706, 269 N.W. 811 (1936). It is a "basic rule that a fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract." *Peters v. Halligan*, 182 Neb. 51, 53, 152 N.W.2d 103, 106 (1967). See, also, *Reilly v. First Nat. Bank & Trust Co.*, 220 Neb. 443, 370 N.W.2d 163 (1985).

The appellant contends that because she and her husband never saw the Bierwagen authorization and loan agreement referred to in the standby agreement, there was no meeting of the minds regarding priorities. The authorization and loan agreement which authorized the Bierwagen loan merely set forth the requirements for the bank to obtain an SBA guaranty of the loan. Among other things, it required a first mortgage on the property and standby agreements from the Gratzfelds and Meeks.

When the Gratzfelds sold the business to Bierwagen, there were still payments due the Meeks under their contract with the Gratzfelds. When the Meeks executed the mortgage to the bank in 1981, they pledged their interest in the property to secure the Bierwagen loan.

Since the Meeks retained title to the land under the purchase agreement until all of the installment payments had been made, they were holding the legal title to the property to secure payment of the debt. They were the legal owners of the realty until the terms of the contract had been satisfied. See *DeBoer v. Oakbrook Home Assn.*, 218 Neb. 813, 359 N.W.2d 768 (1984). The Gratzfelds had equitable ownership of the property under the contract. *DeBoer, supra.* The vendor's and vendee's interests in an installment land contract are both mortgageable. See G. Nelson & D. Whitman, Real Estate Finance Law §§ 3.35, 3.37 (2d ed. 1985). When the Meeks and Gratzfelds signed the mortgage in 1975 and again in 1981, they pledged their interests in the land, which included both the legal and equitable title, to the bank, thereby giving the bank a first mortgage.

The appellant's argument that there was no meeting of the minds regarding the subordination of the Meeks' interest when they voluntarily signed the mortgage and standby agreements is without merit. The evidence shows that the Meeks did not ask to see the authorization and loan agreement referred to in the standby agreement, and there is no evidence of inquiry as to the meaning of the mortgage.

In *Mangan v. Landen*, 219 Neb. 643, 646, 365 N.W.2d 453, 455 (1985), we stated the rule that "one who signs an instrument without reading it, when he can read and has the opportunity to do so, cannot avoid the effect of his signature merely because he was not informed of the contents of the instrument." More recently, we have indicated that ignorance occasioned by a party's inability to understand the language and contents of a contract voluntarily executed is not, absent fraud, a ground for avoiding it, although different from what he supposed. *First Nat. Bank v. Bolzer*, 221 Neb. 415, 377 N.W.2d 533 (1985). We find that the bank obtained a lien on the property which was prior to that of the Meeks.

The appellant next contends that by signing the July 31, 1981, mortgage, the Meeks became gratuitous sureties and were thereby owed a duty of disclosure by the bank. The appellant argues that the bank breached this duty by failing to disclose Bierwagen's SBA loan application, the SBA letter rejecting the loan, and the SBA authorization and loan agreement.

This court has previously defined suretyship as

a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal. The surety's obligation is not an original and direct one for the performance of his own act, but is accessory or collateral to the obligation contracted by the principal.

*Niklaus v. Phoenix Indemnity Co.*, 166 Neb. 438, 445, 89 N.W.2d 258, 262 (1958). A suretyship may also arise by operation of law. L. Simpson, Handbook on the Law of Suretyship, *Formation of the Contract* pt. 1, ch. 2, § 18 (1950). The appellant has cited no authority to support her position that she and her husband were sureties. If it is assumed that they became sureties by mortgaging their property to secure Bierwagen's loan, the evidence does not support a finding of a breach of the duty to disclose.

The appellant relies on *The Bank of Monroe v. The Anderson Bros. Mining and Railway Co.*, 65 Iowa 692, 22 N.W. 929 (1885), as authority for the rule requiring disclosure by a creditor to a surety from whom the creditor is about to accept personal security for a debt. The *Bank of Monroe* court indicated that the duty involves informing the surety of facts within the creditor's knowledge which would have the effect of increasing the surety's risks. The rule provides further that if the potential surety should inquire, before obligating himself,

for information touching any matter materially affecting the risk of the undertaking, he [creditor] is bound, if he assumes to answer . . . at all, to give full information as to every fact within his knowledge; and he can do nothing to deceive or mislead the surety without vitiating the agreement.

*Id.* at 700, 22 N.W. at 933.

Based on her inquiry about the standby, the appellant maintains the bank had a duty to disclose the authorization and loan agreement and that she was misled by the banker's response. In so doing she ignores Gratzfeld's testimony that Steffes' response was that the bank would have a first mortgage and priority, just as the authorization provided. Her argument

also ignores the fact that the Meeks never requested to see the authorization.

As to the SBA loan application, which Steffes indicated contained information important to assessing risks in the loan, we also find there was no material nondisclosure. The application contained a variety of documents including an SBA application form, a personal history statement by Bierwagen, the Gratzfeld-Bierwagen purchase agreement, an estimated financial forecast for the property, an equipment inventory, business history, an education and work experience statement by Bierwagen, a use of loan proceeds statement, and Bierwagen's personal financial statement. While the SBA originally denied the loan on this application, there was nothing express in the substance of these forms to indicate that Bierwagen was financially insolvent or that she would become so in the future.

More importantly, we believe that the inquiry regarding the standby agreement did not trigger a duty of disclosure as to Bierwagen's financial status. Under *Bank of Monroe, supra*, where the surety makes no inquiry on the subject, the duty of disclosure as to facts increasing the risks of the undertaking depends upon the circumstances of the case. Generally, the creditor may assume that the surety has obtained information from other sources or has chosen to assume whatever risks may be involved. *Bank of Monroe, supra*. But a duty of disclosure may arise when the creditor knows or has good grounds for believing (1) the surety is being deceived or misled or (2) the surety has been induced to enter the contract in ignorance of facts materially increasing his risks, of which the creditor has knowledge and the opportunity to disclose prior to the surety's acceptance of the undertaking. Neither of these elements appeared in the present case, as Steffes testified that the Meeks never inquired about Bierwagen's loan application or whether they should allow Gratzfelds to sell to her. Further, the bank was warranted in assuming that the Meeks had obtained information from other sources, since Gratzfeld's testimony indicated that discussions about the sale to Bierwagen were had with and the sale approved by the Meeks prior to Bierwagen's application for the loan.

The same rationale applies to the bank's nondisclosure of the initial SBA denial of Bierwagen's loan and the reasons therefor. Gratzfeld testified that he notified Phillip Meek of the denial, although the appellant maintains she was never so informed. Furthermore, the materiality of the original denial is doubtful because when the SBA took a closer look at Bierwagen and the business, the loan was approved.

In her final assignment of error the appellant maintains that the release of Bierwagen from liability on the July 31, 1981, loan and note should also discharge the Meek obligation because they were not parties to the March 29, 1983, assumption agreement releasing Bierwagen, were not notified or informed that Bierwagen was being released, and did not consent to the release. Again, as we view the record, this argument ignores evidence which supports a decision in favor of the bank.

The appellant relies on *Drexel v. Pusey*, 57 Neb. 30, 77 N.W. 351 (1898), and *In re Estate of Mathews*, 134 Neb. 607, 279 N.W. 301 (1938), for the proposition that "[t]he absolute release of the principal debtor made without notice to or consent of the parties secondarily liable also discharges those parties." Brief for Appellant at 14. See, also, *Coleman v. Beck*, 142 Neb. 13, 5 N.W.2d 104 (1942) (surety released if creditor releases principal debtor without the knowledge and consent of surety).

It is true that the Meeks were not parties to the assumption agreement. Nevertheless, there is substantial evidence that the Meeks were aware of the situation and consented to the release of Bierwagen. Steffes, the banker, indicated that although the Meeks were not present when the assumption agreement was signed and no one at the bank gave them notice of the release or obtained their consent, the Meeks were aware of the situation. Lyle Benson, the SBA representative who handled Bierwagen's loan, testified that he spoke with Edith Meek once before the Gratzfelds assumed the Bierwagen loan, but at a time when she (Bierwagen) was delinquent. Joseph Gratzfeld corroborated the occurrence of this conversation and testified that, during it, the Meeks were made aware of the release and consented to it. He also testified that the Meeks wanted the Gratzfelds to assume Bierwagen's loan because she was threatening

316

bankruptcy, which would have tied up everything. According to Gratzfeld, Bierwagen did ultimately file for bankruptcy.

Reviewing the record de novo, it does not appear that Bierwagen's release was made without the knowledge or consent of the Meeks.

The judgment of the district court is affirmed.

AFFIRMED.