WESTERN FERTILIZER AND CORDAGE COMPANY, INC., APPELLEE, V. BRG, INC., ET AL., APPELLEES, CITY OF ALLIANCE, A MUNICIPAL CORPORATION, APPELLANT AND CROSS-APPELLEE, AND DAVID K. RICE, INTERVENOR-APPELLEE AND CROSS-APPELLANT.

424 N.W.2d 588

Filed June 17, 1988.    No. 86-289.

Rodney P. Cathcart of Erickson & Sederstrom, P.C., and Walter R. Metz of Metz & Metz, for appellant.

Robert G. Simmons, Jr., of Simmons, Raymond, Olsen, Ediger, Selzer & Ballew, P.C., for appellee Western.

Herbert M. Sampson III of Sampson & Forney, for intervenor-appellee.

BOSLAUGH, CAPORALE, SHANAHAN, and GRANT, JJ., and BURKHARD, D.J.

PER CURIAM.

This is an action in equity filed by Western Fertilizer and Cordage Company, Inc. (Western), to foreclose a real estate mortgage and to determine the validity and priority of liens on the real estate for unpaid assessments claimed by the City of Alliance, appellant. David K. Rice, appellee, filed his "Petition in Intervention" asking for a determination of the validity and priority of a statutory construction lien which Rice claimed was due him for unpaid engineering services concerning the real estate. After denying the validity of Rice's construction lien, the district court for Box Butte County found that Western's mortgage was prior to the liens claimed by City of Alliance except as to one lot, on which priority of lien was found in favor of City of Alliance. The court ordered foreclosure of Western's mortgage and sale of the real estate, and reserved jurisdiction to determine distribution of any surplus if the sale proceeds

exceeded the amount due Western. City of Alliance appeals.

Rice did not directly appeal the denial of his construction lien, but raised the issue as a cross-appeal in his "Brief of Intervener-Appellee and Cross Appellant." Pursuant to Neb. Ct. R. of Prac. 1E (rev. 1986), Rice's cross-appeal was dismissed. See *Maricle v. Spiegel*, 213 Neb. 223, 329 N.W.2d 80 (1983), where this court held that an appellee cannot cross-appeal against another appellee. This appeal, therefore, does not address the district court's denial of Rice's lien.

Incorporated in 1959, Western was originally in the business of selling fertilizer and binding twine, but eventually became involved in farming and real estate investments. Western's original stockholders were Mr. and Mrs. Gordon Keeley. Gordon Keeley was president of Western at all times material to this action, and was also president of another corporation, Alliance Tractor and Implement Company (ATI). Max Garwood became an employee, and later a stockholder and vice president, of ATI. Garwood also became a stockholder and secretary-treasurer of Western, but, according to Keeley, was never a vice president of Western. Garwood initially testified that he had been a vice president of Western, but later retracted, admitting that he was only a secretary-treasurer for Western and was apparently confused due to his status as vice president of ATI.

On October 26, 1977, as president of Western, Keeley negotiated and executed a contract to sell a farm to BRG, Inc., for $239,400. Garwood was not active in this transaction. The parties do not dispute that, pursuant to the amended contract between BRG and Western, BRG became the owner of the real estate pursuant to the contract and that BRG gave Western a promissory note which was secured by a valid and recorded mortgage in favor of Western. BRG, owned by Carl Peterson, John Brittan, and David Rice, was in the business of investing in real estate, and planned to develop the property purchased from Western by building low cost, inexpensive residential homes on that land. Brittan was the president of BRG and negotiated the real estate purchase with Western's president, Keeley. The amended contract between BRG and Western provided that, upon payment of a specified amount, Western

would release individual lots from its mortgage, and further provided that Western would subordinate its mortgage by joining in any platting or dedication required to develop the land so long as such platting or dedication did not reduce the value of Western's security. On August 31, 1977, Keeley, as president of Western, signed an "Owner's Certificate and Dedication" in connection with a platting of "Block 1, Homestead Addition." Keeley also signed six partial releases between June 1979 and June 1980, releasing several lots from Western's mortgage.

The real estate conveyed to BRG and mortgaged to Western was developed by BRG and platted as several various "Homestead Additions," namely, Homestead Addition, Homestead First, Homestead Second, and Homestead Third, which were then divided into residential lots for sale. City of Alliance passed several ordinances approving the plats and establishing water, sewer, and street improvement districts. Regarding these ordinances, the City of Alliance engineer and city clerk both testified that they did not discuss the matters contained in the ordinances with officers of Western.

Keeley spent part of his time in Arizona, and during that time Garwood handled Western's day-to-day business needs, such as writing checks and paying bills. In 1977 Brittan asked Garwood to sign some plats and dedications on behalf of Western because Keeley was out of town. On April 20, 1977, Garwood signed three dedications which purported to grant City of Alliance an easement or right-of-way to construct and maintain various improvements upon parcels of the real estate owned by BRG and mortgaged to Western. Brittan signed the dedications on behalf of BRG, and Garwood signed: "[S] *Western Fertilizer & Cordage Co. Inc. by Max R. Garwood."* Garwood also signed a "Ratification of and Consent to Replat" on July 7, 1978, on behalf of Western, as "Vice-President." There were three other plats and dedications executed that covered parcels of property owned by BRG and mortgaged to Western which were signed by Brittan on behalf of BRG, but were not signed by anyone on behalf of Western.

Other than the one dedication Keeley signed on August 31, 1977, Keeley was never asked to sign, and never signed, any

other plat or dedication on behalf of Western. Garwood never told Keeley that he had signed any plats and dedications on behalf of Western. Although Keeley drove by the land on occasion and observed construction in progress, he testified that since Western held BRG's note and mortgage on the property, he was not concerned with the activity on the land because BRG's payments were being made promptly. Keeley further testified that he had specifically told Garwood and Brittan that only he, Keeley, was to handle the platting, dedication, releases, and other matters on behalf of Western. However, neither Garwood nor Brittan could recall Keeley's telling them that.

Keeley and Garwood severed their business relationship in 1982, whereby Garwood became the owner of ATI and Keeley and his family owned Western. BRG defaulted on its note to Western late in 1982. Keeley testified that he first learned that Garwood had signed some plats and dedications on behalf of Western "in the early part of 1983." Shortly thereafter, Keeley complained to City of Alliance officials about Garwood's signing the plats and dedications on behalf of Western. In August of 1983 Keeley sent a letter to the Alliance city manager expressing his concerns about the purported plats and dedications and advised the city that Western did not join in or consent to the plats and dedications signed by Garwood. The letter also advised the city that BRG was in default and that it may be necessary for Western to foreclose its mortgage on the property.

Western brought an action to foreclose its mortgage on certain parcels of the land which it had sold to BRG. City of Alliance, BRG, Carl Peterson, and John Brittan were named as defendants in Western's foreclosure action. In its amended answer, the City of Alliance alleged that Western was guilty of laches and that the city had relied upon the apparent authority of Garwood in creating the improvement districts. City of Alliance further alleged that Western induced the city to create the districts and should be estopped from denying the validity of the dedications or districts. In its cross-petition, City of Alliance claimed lien assessments against the subject real estate totaling over $274,000, and asked for a determination that its

assessments be adjudged to be first liens against the real estate, and for foreclosure of such liens and sale of the property.

At trial, Western offered, and the court received without objection, separate sets of answers to requests for admissions and interrogatories served by Western upon BRG, Carl Peterson, John Brittan, and City of Alliance. Brittan and Peterson admitted that no proceedings at law had been instituted for recovery of the debt owed to Western. City of Alliance claimed it had insufficient information, and, therefore, did not admit that no proceeding at law had been instituted by Western to recover the debt owed by BRG.

The district court found that Western's mortgage had priority over all of the liens claimed by City of Alliance except as to the lot which Keeley had dedicated on behalf of Western. The court further held that Western was entitled to have its mortgage foreclosed and the property sold in order to satisfy Western's mortgage.

City of Alliance assigns 11 assignments of error which, in consolidated form, allege that the district court erred in failing to find that Garwood had actual or apparent authority to sign the plats and dedications on behalf of Western; in failing to find that Western ratified Garwood's acts of signing the plats and dedications; in failing to find that City of Alliance's assessments were properly levied and were first liens against the property; in finding that no action at law had been commenced for the recovery of Western's mortgage indebtedness; and in finding that Western's mortgage had priority over the city's liens and that Western was entitled to foreclose its mortgage.

Since this is an action to foreclose a real estate mortgage, which is equitable in nature, we review this appeal de novo in conformity with Neb. Rev. Stat. § 25-1925 (Reissue 1985). *Meek v. Gratzfeld*, 223 Neb. 306, 389 N.W.2d 300 (1986); *Tilden v. Beckmann*, 203 Neb. 293, 278 N.W.2d 581 (1979).

> In an appeal of an equity action, the Supreme Court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the trial judge heard and

observed the witnesses and accepted one version of the facts rather than another.

*Hughes v. Enterprise Irrigation Dist.*, 226 Neb. 230, 234, 410 N.W.2d 494, 497 (1987); *Platte Valley Fed. Sav. & Loan Assn. v. Gray*, 226 Neb. 135, 409 N.W.2d 617 (1987).

Neb. Rev. Stat. § 77-1917.01 (Reissue 1986) provides in pertinent part:

> All cities, villages and sanitary and improvement districts in Nebraska shall have a lien upon real estate within their boundaries for all special assessments due thereon to the municipal corporation or district, which lien shall be inferior only to general taxes levied by the state and its political subdivisions.

City of Alliance concedes that if the assessments are not valid, then the city has no lien superior to Western's mortgage.

> It is beyond question that in order to render an assessment for improvements valid, the improvements may be constructed only on land in which the public has title or at least a valid easement. City of McCook v. Red Willow County, 133 Neb. 380, 275 N.W. 396. See, also, 14 McQuillan, Municipal Corporations (3d Ed.), § 38.179, p. 448.

*Metropolitan Life Ins. Co. v. SID No. 222*, 204 Neb. 350, 354, 281 N.W.2d 922, 924 (1979).

The plats and dedications signed by Garwood on behalf of Western purported to give City of Alliance easements or rights-of-way to construct and maintain the improvements. A "dedication" of real estate has been defined as a landowner's giving of a right or easement for public use. See, *City of Sioux City v. Tott*, 244 Iowa 1285, 60 N.W.2d 510 (1953); *Clark v. City of Grand Rapids*, 334 Mich. 646, 55 N.W.2d 137 (1952); *Hand v. Rhodes*, 125 Colo. 508, 245 P.2d 292 (1952). In this case, the owner-mortgagor, BRG, indisputably signed the plats and dedications. However, some plats were not signed by an officer of Western, the mortgagee, and others were signed "by Max R. Garwood," underneath Western's company name as it appeared on the various plats. In *Metropolitan Life Ins. Co. v. SID No. 222, supra*, we observed:

> "Fundamental to the law of real property is the rule

that one may not convey or alienate a greater interest in land than he owns, and, consistently with this axiomatic principle, it is firmly established that a mortgagor cannot, without the consent of the mortgagee, make a dedication of the mortgaged premises so as to adversely affect the interest of the mortgagee." Annotation, 63 A.L.R.2d 1160. See, also, Morning v. City of Lincoln, 93 Neb. 364, 140 N.W. 638.

204 Neb. at 354-55, 281 N.W.2d at 925.

City of Alliance contends that Garwood had actual or apparent authority to sign the plats and dedications on behalf of Western or, alternatively, that Garwood's acts in signing the dedications were ratified by Western. Western, on the other hand, argues that Garwood had no authority to sign the dedications and thereby subordinate Western's mortgage and that Western neither consented to nor ratified the purported dedications.

On the issue of agency in this case, City of Alliance bears the burden of proving Garwood's authority and that Garwood's acts, for which Western is to be held accountable, were within the scope of Garwood's authority. See, *Wolfson Car Leasing Co., Inc. v. Weberg*, 200 Neb. 420, 264 N.W.2d 178 (1978); *Nebraska Tractor & Equipment Co. v. Great Lakes Pipe Line Co.*, 156 Neb. 366, 56 N.W.2d 288 (1953).

The proof in this case fails to establish the existence of Garwood's actual authority to sign the plats and dedications on behalf of Western. Keeley alone negotiated and executed the sale of the real estate to BRG for Western. City of Alliance has not directed our attention to a statute, charter, bylaw provision, resolution, or anything in the record, which might indicate that Garwood had actual or express authority to subordinate Western's mortgage by dedicating the parcels of land in question to the City of Alliance. Although, generally, there is a presumption that acts of corporate officers pertaining to ordinary corporate business transactions are authorized by the corporation, when a corporate officer acts outside the scope of ordinary business, no presumption of authority arises and the other party to the transaction is required to make an inquiry into the officer's authority. *PWA Farms v. North Platte State*

*Bank*, 220 Neb. 516, 371 N.W.2d 102 (1985); *Val-U Constr. Co. v. Contractors, Inc.*, 213 Neb. 291, 328 N.W.2d 774 (1983). City of Alliance presents no evidence and no authority to support a finding that, under the circumstances, Garwood's actions in subordinating Western's mortgage were an ordinary business transaction for Western. Absent presumptive authority, and any evidence showing actual authority, City of Alliance has failed to sufficiently show that Garwood had actual or express authority to sign the dedications on behalf of Western.

This court recently defined apparent authority as follows:

> "Apparent authority is the power which enables a person to affect the legal relations of another with third persons, professedly as agent for the other, from and in accordance with the other's manifestation to such third persons. A party who has knowingly permitted others to treat one as his agent is estopped to deny the agency."

*Department of Banking v. Davis*, 227 Neb. 172, 177, 416 N.W.2d 566, 569 (1987). " 'Apparent or ostensible authority to act as an agent may be conferred if the alleged principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon the apparent agency.' " *Id.* (quoting *Wolfson Car Leasing Co., Inc. v. Weberg, supra*). However, apparent authority for which a principal may be liable must be traceable to the principal and cannot be established by the acts, declarations, or conduct of an agent. See, *Draemel v. Rufenacht, Bromagen & Hertz, Inc.*, 223 Neb. 645, 392 N.W.2d 759 (1986); *Hassett v. Swift & Co.*, 222 Neb. 819, 388 N.W.2d 55 (1986).

Here, Keeley admitted that Garwood had authority to pay bills, write checks, and otherwise handle Western's day-to-day business affairs while Keeley was in Arizona. Whether Garwood's actions in signing the dedications were within the scope of Garwood's apparent authority is a question of fact which we must determine on the basis of all the circumstances of the transaction and the business of Western. See *Draemel v. Rufenacht, Bromagen & Hertz, Inc., supra*.

City of Alliance argues that since Keeley signed one dedication in August of 1977, and six releases thereafter, Keeley must have known that the real estate was being subdivided and

that the city would be relying on the dedications. The city also points to Keeley's observations of construction on the land in support of its argument that Western, through Keeley, knew or should have known about the dedications signed by Garwood. However, there is a total lack of proof that Keeley knew that Garwood signed the plats and dedications any earlier than 1983. Keeley testified that he first learned of Garwood's signings on behalf of Western in the early part of 1983, and Garwood testified that he never did tell Keeley about signing the plats and dedications. Since Keeley had earlier signed a dedication and six mortgage releases on behalf of Western, he could reasonably believe that if BRG and City of Alliance wanted Western to join any other dedications, plats, or releases, then they would have Keeley execute those for Western also.

In this case, Garwood believed that he had authority to sign the plats and dedications for Western. Garwood's belief, however, was not enough to bind Western by virtue of Garwood's apparent authority. What we said in *Nebraska Tractor & Equipment Co. v. Great Lakes Pipe Line Co.*, 156 Neb. 366, 56 N.W.2d 288 (1953), is quite pertinent to this case:

> In the absence of an apparent situation which demands the disclosure of the limitations upon the authority of an agent, a principal is not bound at his peril to disclose those limitations. Rather the burden is on the person dealing with a known agent, not to deal blindly and trust the agent's representations as to the extent of his powers, but to use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers. The rule is well stated as follows in 2 Am. Jur., Agency, § 95, p. 76: "A person dealing with a known agent is not authorized under any circumstances blindly to trust the agent's statements as to the extent of his powers; such person must not act negligently, but must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers. In other words, a person dealing with an agent assumes the risk of lack of authority in the agent. He cannot charge the principal by relying upon the agent's assumption of authority which proves to be unfounded. The principal, on the other hand, may act

on the presumption that third persons dealing with his agent will not be negligent in failing to ascertain the extent of his authority as well as the existence of his agency." Cases cited from numerous jurisdictions abundantly support the stated principle.

156 Neb. at 376-77, 56 N.W.2d at 293.

It cannot be said that there was any act or failure to act on the part of Western or its president, Keeley, which created in Garwood an ostensible or apparent agency on which the City of Alliance was entitled to rely without inquiry as to Garwood's authority. Indeed, City of Alliance and BRG executed three dedications without a signature from any Western officer, thereby further discrediting the city's claimed reliance on Garwood's authority. Therefore, City of Alliance has failed to show that Garwood had ostensible or apparent authority to sign the plats and dedications for Western, and Western is not estopped from denying Garwood's authority to sign such documents since Western did nothing to cause an appearance of authority in Garwood. See *Rodine v. Iowa Home Mutual Cas. Co.*, 171 Neb. 263, 106 N.W.2d 391 (1960).

Next, City of Alliance argues that Western ratified Garwood's actions.

"The unauthorized acts of an officer of a corporation may be ratified by the corporation by conduct implying approval and adoption of the act in question. Such ratification may be express, or may be inferred from silence and inaction, and if the corporation, after having full knowledge of the unauthorized act, does not disavow the agency and disaffirm the transaction within a reasonable time, it will be deemed to have ratified it."

*D & J Hatchery, Inc. v. Feeders Elevator, Inc.*, 202 Neb. 69, 74, 274 N.W.2d 138, 141 (1979) (quoting *Citizens Savings Trust Co. v. Independent Lumber Co.*, 104 Neb. 631, 178 N.W. 270 (1920)). See, also, *Bank of Valley v. Shunk*, 215 Neb. 25, 337 N.W.2d 118 (1983); *Drainage District v. Dawson County Irrigation Co.*, 140 Neb. 866, 2 N.W.2d 321 (1942). However, essential to a valid and effective ratification of an unauthorized act is the principal's complete knowledge of the unauthorized act and all matters related to it. *C I T Financial Services of*

*Kansas v. Egging Co.*, 198 Neb. 514, 253 N.W.2d 840 (1977); *Rodine v. Iowa Home Mutual Cas. Co., supra*. Here, as stated earlier, Keeley had no knowledge of Garwood's unauthorized acts until the early part of 1983, and shortly after discovery of those acts Keeley complained to officials of the City of Alliance. In August of 1983, Keeley sent the city a letter disavowing the plats and dedications signed by Garwood. On these facts, Western did not ratify Garwood's unauthorized acts and is not bound by them.

In sum, the plats and dedications signed by Garwood for Western were not properly executed by a duly authorized agent of Western. Therefore, Western did not sign or consent to the dedications, and, consequently, the assessments for improvements upon the land mortgaged to Western are not valid as against Western's mortgage, and are inferior thereto.

Finally, City of Alliance argues that Western failed to prove that no proceedings at law had been instituted for recovery of Western's mortgage indebtedness. As required by Neb. Rev. Stat. § 25-2142 (Reissue 1985), Western alleged in its petition to foreclose its mortgage that no action at law had been commenced to recover the indebtedness owed by BRG and secured by the mortgage to Western. We have held that the burden is on the mortgagee seeking foreclosure to establish by prima facie proof such negative allegation when controverted. See, *Western Pipe & Supply, Inc. v. Heart Mountain Oil Co., Inc.*, 179 Neb. 858, 140 N.W.2d 813 (1966); *Bankers Life Co. v. Peterson*, 178 Neb. 205, 132 N.W.2d 377 (1965); *United Benefit Life Ins. Co. v. Holman*, 177 Neb. 682, 130 N.W.2d 593 (1964). Western offered into evidence, and the district court received without objection, answers to requests for admissions and interrogatories answered by BRG, Peterson, Brittan, and City of Alliance. Although City of Alliance denied that Western had not commenced an action at law to collect the debt owed by BRG, Peterson, Brittan, and BRG admitted that no proceeding at law had been had for recovery of Western's mortgage indebtedness. Whatever objection may have been available to City of Alliance, no objection was made and no limitation on the use of the answers was requested. Consequently, City of Alliance cannot complain in this appeal that the answers or

admissions of the other parties to the litigation are used against the city in establishing that no action at law had been had for recovery of the debt secured by Western's mortgage. See, *PWA Farms v. North Platte State Bank*, 220 Neb. 516, 371 N.W.2d 102 (1985); *McClemens v. United Parcel Serv.*, 218 Neb. 689, 358 N.W.2d 748 (1984).

AFFIRMED.