RICHARD L. CORMAN, APPELLEE AND CROSS-APPELLANT, V. DIANE MUSSELMAN, APPELLANT AND CROSS-APPELLEE.

439 N.W.2d 781

Filed May 19, 1989. No. 87-744.

Donald W. Pederson and Terrance O. Waite, of Murphy, Pederson, Piccolo & Pederson, for appellant.

Nancy S. Freburg, of Freburg & Hoffmeister, and Stephen R. Illingworth, of Tringe & Illingworth, for appellee.

BOSLAUGH, CAPORALE, and GRANT, JJ., and SPRAGUE and MULLEN, D. JJ.

CAPORALE, J.

Following a bench trial in this action for breach of an employment contract, the district court entered judgment in favor of plaintiff-appellee, Richard L. Corman, in the sum of $9,921.99 plus prejudgment interest. Defendant-appellant, Diane Musselman, challenges the judgment by asserting, in summary, that the district court erred in (1) finding the evidence sufficient to support Corman's allegations and (2) awarding prejudgment interest. Corman has cross-appealed, asserting that the district court erred in (1) permitting defendant Musselman to reopen her case after she had rested and (2)

receiving irrelevant evidence, including an exhibit not disclosed at the pretrial conference. We affirm in part, and in part reverse and remand with direction. We also award Corman a statutory attorney fee.

Corman first met defendant Musselman's husband, Rex Musselman, in mid-December of 1984, when both men were undergoing inpatient alcohol treatment at the Veterans' Administration hospital in Grand Island, Nebraska. At this time, Rex Musselman was also suffering with emphysema, spending much of his time in a wheelchair and making use of bottled oxygen. Through Rex Musselman, Corman became interested in the hearing aid business. Corman successfully completed his alcohol treatment program in January of 1985 and, upon release, spent several days each week for the last 2 weeks of January researching what he thought to be Rex Musselman's business.

Rex Musselman was subsequently released from the hospital, whereupon he and Corman, on February 1, 1985, entered into an arrangement whereunder Corman would work for Kearney Hearing Aid Center. Under the terms of this arrangement, Corman was to be employed by the center as a hearing aid sales trainee at $7.50 per hour, with half of that amount to be funded through the Veterans' Job Training Act of 1983, 29 U.S.C. § 1721 (Supp. I 1983). Federal agency documents executed in connection with this arrangement list Rex Musselman as the owner of the center.

On March 6, 1985, Corman entered into the written contract of employment upon which this action is based. The document, prepared by Rex Musselman and executed by him for the center, provides in relevant part that the center would employ Corman

> to serve and perform such duties for [the center] at such time and place and in such manner as the [center] may from time to time direct.

> [Corman] agrees to faithfully perform the duties assigned to the best of [his] ability, to devote his full and undivided time to the transaction of the [center's] business, to make to [the center] prompt, complete and accurate reports of his work and expenses, to promptly remit to [the center] all monies of the [center] collected by

him or coming into his possession, and not to engage in or be engaged in any other interest or business during the existence of this agreement.

In consideration of such service, the [center] agrees to pay [Corman] compensation as follows: THIRTY-FIVE PERCENT (35%) OF SALES.

According to Corman, "35% of sales" refers to "[s]ales of hearing aid and accessories that [he] sold," "accessories" meaning "batteries, cords, receivers, things like that." When this contract was executed, it was Corman's understanding that Rex Musselman was manager of the business and that he had authority to execute the contract.

On the same day, Corman and Rex Musselman also executed a second contract substantially identical to that quoted above but which provided that Corman was employed by Mecon Labs of Kearney, Nebraska, a manufacturer and wholesaler of hearing aids, at the rate of $7.50 per hour. The veterans' job training benefits were then transferred so as to apply to this contract rather than to Corman's employment with the center.

On March 7, 1985, the day following execution of these employment contracts, Rex Musselman explained to Corman "how the company was set up." According to Corman, Rex Musselman told him that "Diane owned the business, but he said he managed them, and he said he ran the show." At other times, Rex Musselman said, according to Corman, that "there [were] two subsidiaries, Mecon Labs and Kearney Hearing Aid Center which were formed in an outfit called Mecon, Inc., Musselmans Electronics Corporation of Nebraska." During Corman's tenure with the center, any questions he had regarding day-to-day operations or purchase of inventory were directed to Rex Musselman.

While employed at the center, Corman generally worked from 7 a.m. until 9 p.m. Monday through Friday, and for 6 to 7 hours on Saturdays. In addition to his duties for the center, Corman's workday embraced his duties for Mecon Labs. This was possible, in Corman's words,

[b]ecause the sales at the [center] was people coming in the door. We didn't travel. I didn't go out generally to the public. I would have no means of transportation, but

when I wasn't busy and they were testing, I was on the phone making contacts with other dispensers around the United States trying to sell the Mecon hearing product.

Corman testified that during the second week of March 1985, he participated in a discussion of the terms of his employment under the March 6 contracts with both defendant Musselman and her husband. During this conversation, which took place in the office at the center, defendant Musselman retrieved copies of the March 6 contracts from the center's files and examined them while discussing their terms with Corman. In this conversation, Rex Musselman and Corman referred to Corman's employment with Mecon Labs as a second job in addition to his employment with the center under the terms of the contract.

By allowing his commissions from the center to accumulate, Corman hoped eventually to accumulate enough money to make a downpayment on the purchase of the business from the Musselmans. According to Corman, defendant Musselman made no objections to this arrangement at that time. During the following months, Corman had periodic conversations with both Musselmans regarding his accumulating commissions, and he kept track of the sum on a monthly basis. Rex Musselman's health deteriorated, and after April, Corman was the only person at the center selling and fitting hearing aid equipment.

Corman introduced sales documents indicating that while employed at the center under the subject contract, he personally completed sales of $53,428.69 worth of hearing aids with accessories. He stated he had received no commissions on these sales despite having made demand for payment. Defendant Musselman corroborated these assertions, declining to dispute the amount and admitting that she had not paid Corman any commissions.

Accurate records of the center's over-the-counter sales of supplies, such as batteries, were not maintained. Records of the center's purchases of such inventory indicate that batteries representing either a profit margin or a total net price to the retail customers of $7,300 passed through the center during Corman's tenure there. However, an unknown portion of these

batteries was destined for the Musselmans' North Platte retail store, leaving it to Corman's "educated guess" to determine the basis of his commissions for sales of batteries through the center. Corman maintains he did not receive his commission on these sales despite his demand for such payment.

Around November 25, 1985, Corman learned in a phone conversation with Rex Musselman that the center had been sold. Corman's subsequent demand for payment of commissions owed was rejected and this action instituted.

For her part, defendant Musselman testified that Rex Musselman, who died February 14, 1986, had been part owner of "Musselmans . . . a corporation in North Platte, Nebraska," and owner of a half interest in Mecon Labs in Kearney, a business in which defendant Musselman also had a half ownership interest.

Defendant Musselman maintained that she owned the center as her separate property, having acquired it by purchase in 1981 from Rex Musselman's cousin and having financed the purchase with her own separate funds. The evidence establishes that Mecon Labs and the center did not operate entirely independently. Defendant Musselman testified that "[a]ll the office paperwork was done at [the center] for Mecon Labs" and that "[t]he office secretary wrote the checks and either I signed them or there was a stamp that had Rex's name on it," both of the Musselmans being authorized to sign checks on behalf of the center.

Although defendant Musselman admitted her participation in the initial decision to hire Corman and the execution of the documents necessary to secure job training benefits, she denied any knowledge of the subsequent contract granting Corman a 35-percent commission on center sales. According to her, she became aware of Corman's written contract with the center only when presented with a copy by her attorney in connection with this lawsuit. She further denied that Rex Musselman had any authority to enter into such a contract with Corman, asserting that her husband had been but a salesman with the center, nothing more. Defendant Musselman also asserted that during the time Corman was associated with the center, Rex Musselman's judgment was periodically impaired as a result of

his illness. Yet, defendant Musselman admitted that Rex Musselman was at the center on a daily basis, that she visited only occasionally, that her husband "handled the day-to-day operations of [the center]," and that "[i]t would maybe appear to people" that Rex Musselman was running the business.

Notwithstanding defendant Musselman's testimony that she had been aware for some time before that Corman was performing work for Mecon Labs, she swore that she first became aware of Corman's written Mecon Labs contract on November 1, 1985, and canceled it the very same day. This document bears a written notation reading "Cancelled 11-1-85 Diane Musselman." In contrast, a contract executed by Rex Musselman for the sale to Corman of an automobile solely owned by defendant Musselman and which she states she also became aware of for the first time on November 1, 1985, bears a written notation reading "Cancelled Nov. 1, 1985 Richard L. Corman." The two notations do not appear to have been penned by the same hand.

Defendant Musselman rested her defense at the conclusion of her testimony. Corman then called as a rebuttal witness the secretary who worked for both Mecon Labs and the center during the time of his employment. She generally corroborated Corman's version of the manner in which the written employment contracts came into existence and testified that until the center's business began to deteriorate in 1985, she had considered Rex Musselman to be its owner. She then learned that defendant Musselman owned the center, but Rex Musselman nonetheless continued to be the person she consulted on day-to-day matters. This witness also testified that defendant Musselman first reviewed Corman's written employment contracts with the center and Mecon Labs within a month of their execution and looked at them on several occasions thereafter. According to the secretary, Rex Musselman received no regular paychecks from the center. Instead, he would take the office's cash receipts home on a weekly basis. All other center employees received paychecks.

Without withdrawing her rest and without objection, defendant Musselman then testified:

Rex worked for me in exchange for using [center] facilities

for his Mecon operation and I paid all of [the secretary's] salary but part of that was supposed to be her work for Mecon. That was his compensation for being a salesman for me. Also he was given cash for expenses.

Defendant Musselman later formally moved to withdraw her rest so as to present evidence regarding amounts paid to Corman during his employment. She was then permitted to testify, over objection, that Corman was paid a gross amount of $9,150 while employed by the Musselmans, including benefits received through the veterans' training program.

Defendant Musselman's first summarized assignment of error challenges the sufficiency of the evidence to support the district court's judgment in general, and particularly regarding Rex Musselman's status as her agent in executing the contract between Corman and the center.

A suit for breach of contract presents an action at law. *Stiles v. Skylark Meats, Inc.,* 231 Neb. 863, 438 N.W.2d 494 (1989); *Reeves v. Hill Aero,* 231 Neb. 345, 436 N.W.2d 494 (1989). The factual findings of a trial court in a law action tried without a jury have the effect of findings of a jury and will not be set aside unless they are clearly wrong. *Stiles v. Skylark Meats, Inc., supra; Marvin E. Jewell & Co. v. Thomas,* 231 Neb. 1, 434 N.W.2d 532 (1989). In reviewing the trial court's judgment in an action at law tried to the court, we do not reweigh the evidence but, instead, consider the judgment in the light most favorable to the successful party and resolve conflicts in favor of the successful party, who is entitled to the benefit of every inference which can reasonably be deduced from the evidence. *Stiles v. Skylark Meats, Inc., supra; Knutson v. Snyder Industries, Inc.,* 231 Neb. 374, 436 N.W.2d 496 (1989); *Reeves v. Hill Aero, supra.*

The district court did not specifically find that an agency relationship existed between the Musselmans but, rather, found that "[Corman] entered into an agreement with [the center] that [he] would be paid 35% of all sales and such contract was binding upon [defendant Musselman] as owner of the business."

While there is contrary evidence, there is nothing which makes the testimony that defendant Musselman was sole owner

of the center inherently incredible. Thus, the court's conclusion that defendant Musselman was the center's owner at the relevant times cannot be said to be clearly wrong. As the discussion which follows demonstrates, the evidence also supports a finding that an agency relationship existed between the Musselmans sufficient to authorize Rex Musselman to enter into the contract on behalf of the center.

Apparent or ostensible authority is the power which enables a person to affect the legal relationships of another with third persons, professedly as agent for the other, from and in accordance with the other's manifestations to such third persons. A party who has knowingly permitted others to treat one as her or his agent is estopped to deny the agency. *Western Fertilizer v. BRG*, 228 Neb. 776, 424 N.W.2d 588 (1988). Apparent authority is such authority as the agent seems to have by reason of the authority she or he actually has. A principal is bound by, and liable for, the acts which an agent does within her or his actual or apparent authority. *Department of Banking v. Davis*, 227 Neb. 172, 416 N.W.2d 566 (1987).

Apparent or ostensible authority to act as an agent may be conferred if the alleged principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon the apparent authority, *Western Fertilizer v. BRG, supra*; yet, the apparent authority or agency for which a principal may be liable must be traceable to the principal and cannot be established by the acts, declaration, or conduct of the agent. *Pioneer Animal Clinic v. Garry*, 231 Neb. 349, 436 N.W.2d 184 (1989); *Western Fertilizer v. BRG, supra*.

The record clearly establishes that defendant Musselman was aware that Rex Musselman held himself out to the community as manager of the center. It strains credulity beyond the breaking point to suggest that one whose facsimile signature is used to imprint the drawer's signature on a business check is merely the sales employee of that business and nothing more. At the very least, by doing nothing to stop her husband from holding himself out as manager of the center, defendant Musselman clothed him with apparent authority to do that which managers normally do, including enter into contracts of employment with third persons. Thus, defendant Musselman's

first summarized assignment of error is without merit.

She next argues that the district court erred in awarding Corman prejudgment interest. Prejudgment interest may not be recovered on an unliquidated claim. A claim is unliquidated where a reasonable controversy exists as to either the right to recover or the amount of recovery. *GFH Financial Serv. Corp. v. Kirk*, 231 Neb. 557, 437 N.W.2d 453 (1989). Although the dollar value of the hearing aid sales Corman completed pursuant to the subject contract was not disputed, Corman claimed, in addition, that he had "sold hearing aid batteries on behalf of the [center] in the total sum of $8,190.00." Not only was this latter amount disputed, but Corman was unable to prove it at trial. The nature and amount of damages cannot be sustained by evidence which is speculative and conjectural. *Nelson v. Dolan*, 230 Neb. 848, 434 N.W.2d 25 (1989). Corman's otherwise unsubstantiated "educated guess" is an insufficient basis upon which to determine what portion of the total batteries purchased during the term of the subject contract were actually sold through the center during that period. Inclusion of a demand for this amount in Corman's allegations of damages under his contract with the center renders the amount demanded for the breach of that contract unliquidated, and Corman was not entitled to prejudgment interest on any amount eventually awarded. Thus, defendant Musselman's second summarized assignment is meritorious.

This brings us to Corman's cross-appeal, in connection with which he first argues that the district court erred by permitting defendant Musselman to withdraw her rest and adduce evidence as to payments which had been made to him. The matter of permitting a party in a civil case to withdraw her or his rest is within the trial court's discretion; thus, the trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. *IAFF Local 831 v. City of No. Platte*, 215 Neb. 89, 337 N.W.2d 716 (1983); *Veik v. The Tilden Bank*, 200 Neb. 705, 265 N.W.2d 214 (1978). It cannot seriously be contended that Corman reasonably believed the payments he received during the course of his employment by the center were not an issue in the case. Under the circumstances, permitting defendant Musselman to withdraw her rest to supply what at that point

appeared to be an oversight in proof constituted no abuse of discretion. Thus, Corman's first assignment of error on cross-appeal is without merit.

Corman next urges the district court erred by receiving irrelevant evidence, including an exhibit not disclosed at the pretrial conference. The exhibit in question is a copy of a Department of the Treasury, Internal Revenue Service W-2 Wage and Tax Statement form reflecting "[w]ages, tips, other compensation" ostensibly paid to Corman by the center during 1985 in the sum of $9,150. The main thrust of Corman's argument is that neither the questioned exhibit, nor any of the evidence touching upon what he was paid, had pertinence to the resolution of the present case. In essence, he urges that notwithstanding defendant Musselman's assertions to the contrary, the amounts reflected on the exhibit and the other questioned evidence concerning payments to him clearly relate to his employment with Mecon Labs and not to his contract with the center, the only contract at issue in this litigation. Thus, while Corman casts this assignment of error in terms of errors in the admission of evidence, he is in reality attacking the district court's evaluation of the questioned evidence.

As discussed earlier, the record establishes that Rex Musselman formed two separate and distinct employment contracts with Corman on March 6, 1985, and that he at least had authority to enter into the center contract. The pertinent contract demonstrates beyond question that from the date of its execution and throughout its term, Corman was employed by the center on a commission, not an hourly, basis. Defendant Musselman herself testified that the amount of wages reflected on the W-2 form was computed on the basis of a $7.50 hourly wage. In the face of that testimony, the pertinent center contract language, and the treatment of the veterans' job training benefits, defendant Musselman's effort to characterize the $9,150 payment as having been made under the contract with the center is inherently incredible. The district court was thus clearly wrong in offsetting any portion of that payment against the commissions Corman earned under his center contract. Corman's second assignment of error on cross-appeal is meritorious.

Accordingly, we affirm the judgment in favor of Corman, but direct that the district court modify the amount thereof by increasing it to $18,700.04, being 35 percent of Corman's completed sales of hearing aids. As our analysis establishes, Corman is not entitled to prejudgment interest.

However, pursuant to the provisions of Neb. Rev. Stat. § 48-1231 (Reissue 1988), there is hereby taxed as costs to defendant Musselman the sum of $4,675.01 for attorney fees to Corman in this court.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTION.