DOUBLE K, INC., A NEBRASKA CORPORATION, DOING BUSINESS AS KING'S BALLROOM, APPELLANT, V. SCOTTSDALE INSURANCE COMPANY, AN ARIZONA CORPORATION, APPELLEE.

515 N.W.2d 416

Filed April 22, 1994.   No. S-92-1005.

Mark A. Johnson, of The Law Offices of Mark A. Johnson, and Scott Freese, of Hutton, Freese & Einspahr, P.C., for appellant.

Daniel D. Jewell, of Jewell, Gatz, Collins, Fitzgerald & DeLay, for appellee.

HASTINGS, C.J., BOSLAUGH, CAPORALE, FAHRNBRUCH, LANPHIER, and WRIGHT, JJ.

WRIGHT, J.

Double K, Inc., doing business as King's Ballroom (Double K), sued Scottsdale Insurance Company (Scottsdale) seeking recovery for a fire loss suffered April 3, 1986. Double K alleged that its multiperil insurance contract had been extended for an additional year by a binder issued by an independent agent who was the apparent or ostensible agent of Scottsdale at the time the binder was issued. Summary judgment was granted for Scottsdale, and Double K appeals.

## SCOPE OF REVIEW

In appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. Summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Hawkins Constr. Co. v. Reiman Corp., ante* p. 131, 511 N.W.2d 113 (1994); *Dugan v. Jensen,* 244 Neb. 937, 510 N.W.2d 313 (1994).

## FACTS

In June 1984, Double K purchased from Scottsdale a fire and casualty insurance policy covering the personal property inside King's Ballroom. The policy was purchased through Roger Hanson, a licensed insurance agent, and through the Scribner Insurance Agency (Scribner). The policy was to provide coverage in the amount of $76,000 and was to run from June 6, 1984, to June 6, 1985.

On June 6, 1985, Hanson issued to Double K an insurance binder which purportedly extended the coverage on the policy. Double K alleged that the binder was signed by Hanson as an agent and authorized representative of Scottsdale. Double K also alleged that when it received the binder, the premium was not stated thereon and was not paid because Hanson had told Double K that a refund due from another insurance policy would be applied to the renewal premium on the personal property policy.

In December 1985, Hanson sold all interest in his business to Sirek Agency, Inc., doing business as Town & Country Agency (Town & Country). Town & Country held a resident agent's license and was licensed to place insurance upon risks located in Nebraska through nonadmitted insurance companies acting as a surplus-lines agent.

On April 3, 1986, fire destroyed Double K's personal property, resulting in a loss exceeding $76,000. Town & Country notified Scottsdale, which disclaimed any liability and claimed that Hanson had no authority to issue the binder on Scottsdale's behalf. As a result, Double K sued to recover on the policy.

Double K alleged that Scottsdale, a nonadmitted insurance company, did business in Nebraska through its general agent, Diversified X/S Underwriters (Diversified). Double K further alleged that after Hanson sold all his interest in the insurance business to Town & Country, Double K was told by Town & Country that the agency had a binder.

Double K alleged that Hanson had authority as an agent in fact of Scottsdale to issue the binder by virtue of the following: (1) Double K paid its premium by and through Hanson; (2) Scottsdale failed to notify Double K that Hanson was not its agent or agent in fact; (3) by Double K's directing all

communication by and between Scottsdale and Double K through Hanson, Double K was led to believe by Double K's acts that Hanson was an agent of Scottsdale; and (4) by Scottsdale's failure to personally notify Double K of the cancellation of the policy, Double K was further led to believe it had coverage obtained through Hanson. Double K alleged that Hanson had implied and apparent authority to issue the binder on behalf of Scottsdale and that Scottsdale was estopped to deny otherwise.

The district court found that Hanson was at no time advised by anyone that he could issue a binder, that Hanson did not issue the binder, and that Hanson was not an agent of Scottsdale, nor was there any apparent authority on behalf of Hanson to act as an agent for Scottsdale. The court found that Hanson, not Scottsdale, led Marvin Konopasek, Double K's founder, to believe that Hanson had authority to act for Scottsdale. The court concluded that Hanson's apparent authority was not traceable to Scottsdale, and there was no evidence that any of Hanson's acts concerning the issuance of the written binder were traceable to Scottsdale.

## ASSIGNMENT OF ERROR

Double K alleges the district court erred in sustaining Scottsdale's motion for summary judgment.

## ANALYSIS

Because this is an appeal from an award of summary judgment, we are required to view the evidence in a light most favorable to Double K and give it the benefit of all reasonable inferences deducible from the evidence. See *Hawkins Constr. Co. v. Reiman Corp., ante* p. 131, 511 N.W.2d 113 (1994). Double K claims that Scottsdale and its agents allowed Double K to believe that Hanson was an agent for Scottsdale and that, therefore, the binder issued by Hanson was effective to provide coverage for the loss from the fire.

Double K must prove that Hanson had authority to provide the binder. The burden is upon the party alleging the existence of the agency relationship to prove that the "agent's authority and the agent's acts, for which liability against the principal is sought, are within the scope of the agent's authority." *Wolfson*

*Car Leasing Co., Inc. v. Weberg,* 200 Neb. 420, 426, 264 N.W.2d 178, 182 (1978). See, also, *Western Fertilizer v. BRG,* 228 Neb. 776, 424 N.W.2d 588 (1988).

Double K purchased the multiperil policy for the period of June 6, 1984, to June 6, 1985. Hanson had previously handled Double K's renewal and financing of premiums for a similar policy carried through the Mission Insurance Companies, which policy had been canceled during its term for underwriting reasons. In 1984, Hanson asked Scribner to obtain this type of policy for Double K. Scribner contacted Diversified, a brokerage firm which placed hard-to-write insurance and represented companies which were not licensed to do business in Nebraska. Diversified found the policy available through Scottsdale, which was not admitted to sell insurance in Nebraska. Scribner received a quote from Diversified and asked that the coverage be bound effective June 6, 1984. Diversified requested a completed application, which was received from Scribner on June 21, 1984.

Scribner received the original policy and an agent's copy which showed the agent's name as Diversified. Scribner forwarded the bill and policy to Hanson, who delivered the policy to Konopasek. Hanson then arranged for financing of the premium, which amounted to $3,791.30.

In February 1985, Hanson sold the casualty portion of his insurance business to Town & Country, but the sale did not include the policy covering King's Ballroom, which policy was still owned by Scribner. Subsequently, Hanson received a renewal form from Scribner which asked for a breakdown of the sales at the ballroom. Konopasek verbally provided that information to Hanson, who transferred it to a request form which he returned to Scribner. Hanson stated that he assumed Scribner would send the form to Diversified, which would then forward it to Scottsdale.

Scribner received a letter dated April 17, 1985, from Diversified regarding the renewal of the policy. Scribner sent the application to Hanson, advising him that a completed application was needed to obtain a quote for the premium for renewal of the policy. When Scribner did not receive the completed application from Hanson, it sent a second notice

asking for the completed application before June 6, 1985. No response was received from Hanson. Scribner then received a letter from Diversified stating that the coverage had expired, its file had been closed, and an audit was scheduled to follow. Scribner wrote to Hanson, stating that because it assumed that Hanson had written the policy with another company, the Scribner file was being closed.

Hanson then issued the binder in question effective June 6, 1985. The binder was signed by Hanson, but was not dated. Hanson stated that he provided a copy of the binder to Konopasek, but a copy was never sent to Scribner.

Hanson never received a policy subsequent to the 1984-85 policy, and he had no further communication with Scribner about the policy. Hanson stated he never had any oral or written communication with Scottsdale or Diversified about renewing the policy for 1985-86.

Hanson testified that he had no agency or brokerage agreement with Scottsdale or Diversified, and although he had an agreement with Scribner, he had no copy of it. Scribner had a written agreement with Hanson to pay him a percentage of the commission for any business written by Hanson, who was treated as an independent agent and was not considered an employee of Scribner's. Hanson admitted that there was no valid binder issued on the policy, nor was there a certificate of insurance issued to Double K for the coverage in question.

Scribner never received a completed renewal application from Hanson, a binder for the renewal policy, or a premium for the renewal year. Scribner did not apply for a renewal through Diversified, did not have any direct contact with Scottsdale, and did not receive a notice of cancellation on the policy from Diversified or Scottsdale. Konopasek, who owned only the personal property in the ballroom, testified that he had little direct contact with Hanson and that he did not know if he had seen the policy. He believed that he had seen the June 6, 1985, binder when Hanson gave it to him. Konopasek stated that Double K did not pay a premium for 1985-86 because it never received a premium notice or a policy. Scottsdale had not notified Double K that the insurance had lapsed, and Konopasek believed the policy was good because a copy of the

binder should have gone to Scottsdale. He did not remember with whom he filed the fire claim. Konopasek stated he was under the impression and belief that Hanson, through Scribner, had a grant of authority from Scottsdale to bind the insurance coverage.

The associate vice president in charge of Scottsdale's general commercial property department explained that Scottsdale operates through managing general agencies. Scottsdale gives the general agencies written binding authority via contracts to issue policies in states where it is not admitted. In Nebraska, Diversified is an authorized agent of Scottsdale. Neither Scribner nor Hanson was licensed as a general agent for Scottsdale in Nebraska. Scottsdale had no records to show that the policy was renewed after June 1985. Only Diversified had the authority to issue a binder, and it did not have the authority to appoint Hanson to issue the binder.

On April 17, 1985, when Diversified sent Scribner an application form for renewal of the policy in question, Diversified stated that if it did not hear from Scribner, the coverage would expire and Diversified would close its file. The same letter was sent on May 16. On June 6, Diversified sent Scribner a copy of the April 17 letter which included the May 16 reminder and a note saying that the file had been closed and an audit would follow. In the audit, which was ordered on August 15, the auditor reported that Konopasek stated he had dropped the policy as of June 1, 1985. The auditor stated that he attempted to complete the audit, but Konopasek told the auditor that Double K had dropped the policy and that he would not provide any further information because he no longer had the policy. The auditor returned the worksheet as an incomplete audit.

In March 1986, Diversified received an application from Town & Country asking for a policy for Double K. On April 1, Diversified notified Town & Country that it was declining to offer a quote because Diversified had previously written insurance for Double K and the owner had been uncooperative in providing audit information. On April 8, Diversified received a note from Town & Country referring to a binder dated June 6, 1985, and Diversified notified Town & Country

that it had no knowledge of the binder, which was not authorized by Diversified or Scottsdale, and that the policy had expired June 6, 1985, and had not been renewed.

The record contains certificates from Nebraska's Department of Insurance which state that neither Scribner nor Hanson ever held a surplus-lines license and that Arnold Gebers, an employee of Scribner, and Hanson were not licensed as surplus-lines agents. Hanson was not licensed to sell insurance for Scottsdale or Diversified.

Summary judgment in this case is proper if the evidence shows no genuine issue of material fact as to whether Hanson had authority or apparent authority to issue the binder which Double K alleges led it to believe it was covered. There is no material issue of fact as to whether Hanson had actual authority from Scottsdale to issue the binder. Hanson stated he had no agency agreement with Scottsdale or Diversified and admitted that no valid binder was issued on the policy and that a certificate of insurance was not issued to Double K.

We address whether Hanson had any apparent authority to issue the binder. In *Corman v. Musselman*, 232 Neb. 159, 167, 439 N.W.2d 781, 787 (1989), we held:

> Apparent or ostensible authority is the power which enables a person to affect the legal relationships of another with third persons, professedly as agent for the other, from and in accordance with the other's manifestations to such third persons. A party who has knowingly permitted others to treat one as her or his agent is estopped to deny the agency. . . . Apparent authority is such authority as the agent seems to have by reason of the authority she or he actually has. A principal is bound by, and liable for, the acts which an agent does within her or his actual or apparent authority.

(Citation omitted.)

The evidence shows that Hanson had no apparent or ostensible authority to issue the binder or to lead Double K to believe that the policy had been renewed. Apparent or ostensible authority "may be conferred if the alleged principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon the apparent authority." *Id.* The

alleged principal in this case, Scottsdale, took no affirmative or intentional action to cause Double K to act upon Hanson's alleged authority. "[T]he apparent authority or agency for which a principal may be liable must be traceable to the principal and cannot be established by the acts, declaration, or conduct of the agent." *Id.* Double K has failed to establish that Hanson's actions could be traced to Scottsdale.

Double K's witnesses stated that they never received a copy of the renewal policy, nor did Double K pay a premium for the policy. "The continuance of the insurer's obligation is conditional upon the payment of premiums, so that no recovery can be had upon a lapsed policy, the contractual relation between the parties having ceased." *Struve Enter. v. Travelers Ins. Co.*, 243 Neb. 516, 520, 500 N.W.2d 580, 584 (1993). Accord *Baker v. St. Paul Fire & Marine Ins. Co.*, 240 Neb. 14, 480 N.W.2d 192 (1992). "The burden is on an insured to keep a policy in force by the payment of premiums, rather than on the insurer to exert every effort to prevent the insured from allowing a policy to lapse through a failure to make premium payments." *Struve Enter.*, 243 Neb. at 520, 500 N.W.2d at 584.

Hanson was an independent insurance agent licensed to write insurance for several agencies, but Scottsdale was not one of those agencies. The evidence here supports a finding that Hanson was acting as an insurance broker. He served as a middleman between Double K and Scottsdale, was not employed by any specific company, and placed insurance with a company selected by himself. In *Moore v. Hartford Fire Ins. Co.*, 240 Neb. 195, 200-01, 481 N.W.2d 196, 200 (1992), we held:

> [A]n insurance salesman who solicits business for more than one company, with no power to bind a specific insurer without its permission, and who is asked by the client to procure coverage from whomever possible at the lowest price, is not the agent of the insurer selected, even if he uses application forms or advertising decals with that insurer's name. *Motors Ins. Co. v. Bud's Boat Rental, Inc.*, 917 F.2d 199 (5th Cir. 1990) (applying Louisiana law).

. . . .

. . . [A]s a matter of law, the failure of an independent insurance broker to provide coverage requested by a client is not imputable to the insurer issuing the policy.

It is undisputed that Double K paid no premium, no renewal policy was issued, and no certificate of insurance was issued. Konopasek told an auditor that he had dropped the policy in June 1985. The actions of Hanson in attempting to bind Scottsdale to provide coverage are not imputable to Scottsdale. No evidence shows that Hanson had any actual or apparent authority to act, and there exists no material question of fact on this issue. The trial court properly granted summary judgment for Scottsdale.

Double K attempts to argue that Scottsdale should be estopped from denying coverage because its actions led Double K to believe that it had insurance. In order for Double K to establish a ground of recovery based on equitable estoppel, it must first establish the existence of the elements of estoppel. See *Perry v. Esch*, 240 Neb. 289, 481 N.W.2d 431 (1992). The first element Double K must establish is that Scottsdale engaged in conduct which amounted to a false representation or concealment of material facts or at least was calculated to convey the impression that the facts were otherwise than or inconsistent with those which Scottsdale now attempts to assert. There is no evidence that Scottsdale or any of its agents had actual contact with any representative of Double K. No evidence indicates that Scottsdale took any actions which were intended to convey to Double K that there was a valid binder issued for insurance. Since Double K cannot establish the first essential element of estoppel, we need not consider whether any other elements of estoppel are present. Each element of equitable estoppel must be proved by clear and convincing evidence. *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989).

The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law if the evidence presented for summary judgment remains uncontroverted.

*Howard v. State Farm Mut. Auto. Ins. Co.*, 242 Neb. 624, 496 N.W.2d 862 (1993). After the moving party has shown facts entitling it to judgment as a matter of law, the opposing party has the burden to present evidence showing an issue of material fact which prevents a judgment as a matter of law for the moving party. *Healy v. Langdon, ante* p. 1, 511 N.W.2d 498 (1994). Double K has not met this burden, and we find that the trial court was correct in granting summary judgment to Scottsdale on the issues of agency and estoppel.

The decision of the trial court is affirmed.

AFFIRMED.

WHITE, J., participating on briefs.