Appeals' determination that Abdullah's remaining ineffective assistance of trial counsel claims were alleged with insufficient specificity and thus lacked "merit." We find, instead, that the merits of these arguments cannot be reviewed upon the trial record. To that extent, the Court of Appeals' decision is reversed.

Affirmed in part, and in part reversed.

Heavican, C.J., not participating.

———————

deNourie & Yost Homes, LLC, a Nebraska limited liability company, appellant, v. Joe Frost and Amy Frost, husband and wife, and Security State Bank, doing business as Dundee Bank, a Nebraska corporation, appellees.

___ N.W.2d ___

Filed September 26, 2014.    No. S-13-656.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Equity: Estoppel.** Although a party can raise estoppel claims in both legal and equitable actions, estoppel doctrines have their roots in equity.

4. **Equity: Appeal and Error.** In reviewing judgments and orders disposing of claims sounding in equity, an appellate court decides factual questions de novo on the record and reaches independent conclusions on questions of fact and law. But when credible evidence is in conflict on material issues of fact, an appellate court considers and may give weight to the fact the trial court observed the witnesses and accepted one version of the facts over another.

5. **Contracts: Fraud.** A party to a business transaction can be liable to another party for failing to disclose a fact that he or she knows may justifiably induce the other to act or refrain from acting in the transaction. But a nondisclosing party can only be liable if it was under a duty to the other to exercise reasonable care to disclose the fact at issue.

6. **Fraud: Proof.** A fraudulent misrepresentation claim requires a plaintiff to establish the following elements: (1) A representation was made; (2) the representation

was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff should rely on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result.

7. **Fraud.** Misleading half-truths can constitute fraud. When a party makes a partial or fragmentary statement that is materially misleading because of the party's failure to state additional or qualifying facts, the statement is fraudulent. Fraudulent misrepresentations may consist of half-truths calculated to deceive, and a representation literally true is fraudulent if used to create an impression substantially false. To reveal some information on a subject triggers the duty to reveal all known material facts.

8. ____. If a defendant's partial or ambiguous representation is materially misleading, then the defendant has a duty to disclose known facts that are necessary to prevent the representation from being misleading.

9. ____. A party's mere silence about its financial condition cannot constitute a misrepresentation unless the other party asks for the information.

10. ____. The recipient of an intentionally false statement of material fact may justifiably rely on the statement if the recipient would have to investigate to discover the truth.

11. ____. The recipient of a representation must exercise ordinary prudence to ascertain its truth when the means of discovering the truth was in his or her hands. But in claims of intentional misrepresentations, this rule applies only in limited circumstances.

12. **Negligence: Fraud.** A plaintiff's contributory negligence is not a defense to claims of intentional misrepresentation.

13. **Fraud: Notice.** Absent information that should put a recipient on notice that a representation may be false, a person may generally rely on the truth of another's representation.

14. **Fraud.** In intentional misrepresentation cases, a plaintiff fails to exercise ordinary prudence only when the plaintiff's reliance was wholly unreasonable, given the facts open to the plaintiff's observation and his or her own skill and experience.

15. **Conspiracy: Words and Phrases.** A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.

16. **Conspiracy: Damages.** The gist of a civil conspiracy action is not the conspiracy charged, but the damages the plaintiff claims to have suffered due to the wrongful acts of the defendants.

17. **Conspiracy: Proof.** A party does not have to prove a civil conspiracy by direct evidence of the acts charged. It may be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purpose to be accomplished. It is, however, necessary to prove the existence of at least an implied agreement to establish conspiracy.

18. **Actions: Conspiracy: Torts.** A civil conspiracy is only actionable if the alleged conspirators actually committed some underlying misconduct. That is, a conspiracy is not a separate and independent tort in itself; rather, it depends upon the existence of an underlying tort.

19. **Conspiracy: Torts: Proof.** A claim of civil conspiracy requires the plaintiff to establish that the defendants had an expressed or implied agreement to commit an unlawful or oppressive act that constitutes a tort against the plaintiff.

20. **Conspiracy: Torts.** A plaintiff is not required to plead the underlying tort of civil conspiracy as a separate claim against the defendants.

21. **Rules of the Supreme Court: Pleadings.** Under Nebraska's liberal pleading rules, a party is only required to set forth a short and plain statement of the claim showing that the pleader is entitled to relief.

22. **Notice.** A plaintiff's allegations are sufficient if they give the defendant fair notice of the claim to be defended against.

23. **Appeal and Error.** For an appellate court to consider an alleged error, a party must specifically assign and argue it.

24. **Forbearance: Estoppel.** A claim of promissory estoppel requires a plaintiff to show (1) a promise that the promisor should have reasonably expected to induce the plaintiff's action or forbearance, (2) the promise did in fact induce the plaintiff's action or forebearance, and (3) injustice can only be avoided by enforcing the promise. A plaintiff need not show a promise definite enough to constitute a unilateral contract, but it must be definite enough to show that the promisee's reliance on it was reasonable and foreseeable.

25. **Estoppel: Proof.** In an estoppel claim, a plaintiff generally fails to show that he or she reasonably and in good faith relied on the defendant's false statements or conduct if it knew or had reason to know that the misrepresentations were false when made or when it acted in reliance upon them.

26. **____: ____.** A plaintiff must establish each element of equitable estoppel by clear and convincing evidence.

27. **Fraud: Estoppel: Proof.** A clear and convincing standard of proof applies to a promissory estoppel claim resting on allegations of fraud.

28. **Fraud: Proof.** In claims for equitable relief, Nebraska law imposes a clear and convincing standard of proof for allegations of fraud. But it does not impose a clear and convincing standard of proof for fraud claims in actions at law.

29. **____: ____.** The standard of proof for fraudulent misrepresentation claims is proof by a preponderance of the evidence.

30. **Issue Preclusion: Proof.** Issue preclusion does not apply to a party who had a higher standard of proof in the first action than the standard that applies in a later proceeding.

Appeal from the District Court for Douglas County: Gary B. Randall, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Jerrold L. Strasheim for appellant.

Christopher J. Tjaden, Michael J. Whaley, and Adam J. Wachal, of Gross & Welch, P.C., L.L.O., for appellee Security State Bank.

Kristopher J. Covi, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellees Joe Frost and Amy Frost.

Heavican, C.J., Wright, Connolly, McCormack, Miller-Lerman, and Cassel, JJ.

Connolly, J.

## I. SUMMARY

deNourie & Yost Homes, LLC (D&Y), contracted with Joe Frost (Frost) and Amy Frost to finish construction on a house the Frosts had started with another builder but had discontinued 1½ years earlier. The Frosts defaulted on progress payments after D&Y started work. D&Y eventually sued the Frosts and Security State Bank, doing business as Dundee Bank (the bank). It claimed, in part, that at different times, the defendants falsely represented or concealed material information about whether the Frosts could pay for the work.

In D&Y's operative complaint, it alleged five claims against the Frosts and the bank: (1) breach of contract against the Frosts; (2) fraud, concealment, and nondisclosure against the Frosts for representing that they could pay for D&Y's work when they were insolvent and could not perform their obligations under the contract; (3) civil conspiracy against Frost and the bank for falsely creating the appearance, after D&Y had stopped work, that the Frosts were solvent, to induce D&Y to resume work; (4) equitable estoppel against the bank, as guarantor; and (5) promissory estoppel against the bank to enforce its promise to pay funds directly to D&Y for its services.

The district court sustained the defendants' motions for summary judgment on the fraud and conspiracy claims. In April 2012, before the bench trial began on the remaining claims, the Frosts confessed judgment on D&Y's breach of contract claim. And after the bench trial, the court ruled for the defendants on D&Y's equitable and promissory estoppel claims. D&Y assigns error to all the court's rulings.

We will explain our holdings with some specificity in the following pages, but briefly stated, we hold as follows:

• The court erred in granting summary judgment to the Frosts on D&Y's fraud claim because genuine issues of material

fact existed whether the Frosts had intentionally made false or misleading representations that they could pay for D&Y's work.

• The court erred in granting summary judgment to the bank on D&Y's civil conspiracy claim because the complaint was sufficient to put the bank on notice that the claim rested on the bank's alleged conspiracy to commit fraud.

• The court erred in granting summary judgment to the Frosts on D&Y's civil conspiracy claim because its ruling rested on its incorrect judgment that D&Y's fraud claim failed as a matter of law and because it failed to consider that D&Y alleged two separate instances of fraudulent conduct.

• In the bench trial, the court did not err in finding that D&Y had failed to prove by clear and convincing evidence that the bank promised to finance D&Y's construction contract and to pay these funds directly to D&Y.

But the court's factual findings in the bench trial do not preclude D&Y's proof of the same facts for its fraud claims because a preponderance standard of proof governs those claims, instead of the clear and convincing standard that applied to the claims in the bench trial. We affirm in part and reverse in part the judgment and remand the cause to the court to conduct further proceedings consistent with this opinion.

## II. BACKGROUND

### 1. Historical Facts

In September 2004, the Frosts obtained two loans for a new home: a $133,000 loan to purchase a lot and a $712,500 construction loan. The construction stopped in December 2005. The bank was not the lender for either loan. But in 2007, the bank made several business loans to the Frosts. The Frosts used these loans to acquire and renovate houses, which they then sold or rented.

In April 2007, the Frosts contracted with D&Y to complete their house. The previous builder had completed the exterior of the house, but not the interior. Jon deNourie and Shane Yost are the principals of D&Y. The "Recitals" section of the contract stated that the original construction had stopped in December 2005 "due to builder default." The contract made

the Frosts the general contractor. They were to pay D&Y for materials and labor and directly pay subcontractors. D&Y was the project manager. It would obtain subcontractors and approve their invoices for payment by the Frosts and also furnish materials. D&Y would bill the Frosts for outstanding invoices. The Frosts agreed to pay $51,280 to D&Y for management services. The parties estimated construction costs to be $274,350. The contract also required the Frosts to make monthly progress payments during construction.

Yost testified in his deposition that before D&Y signed the contract, Frost told him that he had sued the previous builder but that they had settled the case and there were no liens against the property. Yost also testified Frost told him that $200,000 from the original construction loan was available for the work and that he could easily obtain an additional $75,000. The contract's recitals stated that the Frosts had "made arrangements for financing" to complete construction of the house.

But in his deposition, Yost said that sometime in 2008, after the Frosts defaulted on D&Y's contract, he learned that the first builder had sued the Frosts and that there were liens against the property. The record from the bench trial showed that the first builder had filed a lien against the property in April 2005 because the Frosts had defaulted on their payments. The builder had sought a $315,567.52 judgment and a decree of foreclosure. Yost said that D&Y would not have contracted to do the work if it had known that the previous builder had sued the Frosts. Yost stated that because of Frost's representations, D&Y did not perform independent research on the property.

After D&Y sent the first bill to the Frosts in May 2007, they defaulted. They did not pay the entire bill, and they wrote a check with insufficient funds to a subcontractor. After that, D&Y required the Frosts to pay the money they owed directly to D&Y so it could pay its subcontractors. By August 1, the Frosts were substantially behind in payments. On August 20, Frost told deNourie and Yost that he had not obtained financing from his construction lender but that he was meeting with the president of the bank to obtain funding.

In early October, D&Y stopped work because the Frosts had failed to pay the amount owed or to provide a commitment letter from a lender.

At some point, D&Y informed Frost that it intended to file a lien. After that, the parties attempted to negotiate. At a November 1, 2007, meeting, Frost told deNourie and Yost that the bank would be providing funding for the construction. Frost told Yost that although he still had $200,000 left from the construction loan, he had to get the loan extended to make a draw against it. On November 14, Frost told D&Y that he had received an extension for the construction loan and wrote checks to D&Y for about $34,000. D&Y refused to resume work because the Frosts owed considerably more.

On November 27, 2007, Amy Frost asked Yost, via e-mail, to stop e-mailing her about the money the Frosts owed. She stated that she had only $800 in her checking account, that the Frosts had drained their retirement savings, that they owed $60,000 to a lawyer, and that she was worried whether they could pay their mortgage payments and subcontractors. On November 30, D&Y filed a construction lien against the property for $208,896.41. The Frosts had paid a little over $108,000 toward the total contract price.

On December 10, 2007, Jeff Royal, the president of the bank, sent the following e-mail to Frost, which Frost then forwarded to Yost on December 11:

> Per our conversation - please provide this e-mail to your builder, [D&Y], that you have funds available to complete the renovation of your property . . . .
>
> If anyone from [D&Y] needs any additional information on this e-mail please have them call me directly . . . .

deNourie believed that this e-mail showed the funds would come from the bank because Royal could not have been referring to funding from any other lender. From his experience with construction loans, deNourie believed that Royal could not have made this statement without knowing the payments that had been made and the amount of money needed to complete the project. According to Yost, he called Royal on December 11, 2007, and said that D&Y was considering foreclosure and would continue the work only if the bank would

pay the amount of its lien directly to D&Y. Yost said that during this call and later calls, Royal assured him that the bank would provide the funding and a letter detailing the terms. Yost testified that on December 11, at Royal's request, he sent an e-mail to Royal to confirm their conversation:

> As per our discussion, the intent of the requested letter is to document the exact funds necessary to complete the Frost Home . . . .
>
> The key to this is not only total funds to be paid out, but also the timing of these funds to be distributed to [D&Y]. This letter will enable us to work w/ the subs in when and how they will get paid.
>
> Thus, the following items will help in this purpose:
>
> 1) The amount to be paid directly to [D&Y] will be $208,896.41.
>
> 2) The above funds will be paid directly to [D&Y] upon [the Frosts'] move-in date, refinancing/closing of the home, or Certificate of Occupancy . . . whichever comes first.

Yost said that he then called Royal, who told him that D&Y should proceed with construction because the bank would provide the necessary funding. Yost said that D&Y relied on this oral commitment from Royal and wanted a confirmation letter only to assure its subcontractors that funding for their work was secure.

D&Y resumed work on December 12, 2007, and paid a significant amount to subcontractors. Yost said that on December 13, 17, and 21, he again spoke with Royal, who assured him that funding would be available and that the bank would pay the funds directly to D&Y. Yost said that during these calls, Royal repeatedly assured him that the bank would send him a written confirmation letter, but Royal never sent the letter. On December 19, Yost e-mailed Royal to ask whether Royal had written the letter. The record shows no e-mail response from Royal until January 3, 2008. According to Yost, during a telephone conversation on December 31, 2007, Royal said that he had asked Frost to contact the lot lender about obtaining the construction loan because it held the first mortgage lien against the property, but that the bank would provide

the funding if the lot lender did not. Yost testified that until December 31, D&Y never heard about the lot lender's possibly loaning the Frosts money.

Royal's testimony conflicted with the testimony of deNourie and Yost. Royal admitted that on the same day he sent the December 10, 2007, e-mail, Frost had told him he might need money to pay his builders, and that he sent the e-mail at Frost's request. And Royal admitted that he had not verified Frost's available cash or credit worthiness. But Royal said he did not have a specific plan to provide funds to D&Y when he sent the e-mail. He testified that the reason he stated Frost had funds available was because (1) he knew Frost had recently generated income from real estate transactions on projects the bank had financed and (2) Frost had told him that Amy Frost's father would make funds available to them for the house. Although Royal had not spoken to Amy Frost's father when he sent the e-mail, he said he was not committing the bank to loan the Frosts money by stating that they had funds available because he knew that Amy Frost's father wanted to help them. Royal said he was simply committed to helping the Frosts come up with the money.

Regarding his conversations with Yost, Royal said he told Yost that Frost had mentioned getting money from the lot lender so that he would not need help from Royal. But deNourie testified that D&Y would not have resumed work if Royal had said that Frost was seeking a loan from the lot lender. Royal denied telling Yost that the bank would directly pay D&Y the amount of its lien. Royal could not recall having a telephone conversation with Yost about an agreement with the bank on December 11 or 19, 2007. Royal said he never sent a written confirmation to provide funding because the Frosts never applied for a loan.

On January 3, 2008, Royal replied to Yost's December 19, 2007, e-mail asking whether Royal had written a confirmation letter yet. In Royal's January 3, 2008, response, he asked whether Yost had ever connected with Frost on "this." Yost testified that he understood "this" to refer to a possible loan from the lot lender. Yost responded to Royal that Frost had

not returned his calls. He asked Royal to contact Frost and find out whether Frost was going to "refinance" through the lot lender or the bank. Yost said D&Y would like to have the financing resolved because D&Y was close to finishing the house.

On January 4, 2008, Yost sent an e-mail to Frost stating that Royal was waiting to hear from Frost about the financing. He asked Frost to verify Royal's statement that Frost was seeking a loan from the lot lender but that otherwise Royal would "set it up" at the bank. Frost did not respond. Royal testified that by "set it up," he meant that he would "be open to working with the Frosts and their overall financial picture to make funds available for [D&Y] to the extent that [the Frosts] wanted them."

On January 10, 2008, Royal sent an e-mail to Yost stating that Frost had said he was "in good shape" with the lot lender and asking Yost to confirm that information. Neither Frost nor Royal replied to Yost's later inquiries about the financing. On January 30, the house was inspected and approved for occupancy.

On March 3, 2008, Frost told Yost that the lot lender would not provide a loan to the Frosts but that he was working with the bank to obtain the money. Royal acknowledged that after the lot lender refused to loan the Frosts money, he spoke to Frost about possibly loaning money to Amy Frost's father, who would provide the money to the Frosts to pay D&Y. Royal said to settle the dispute with D&Y, the bank loaned $150,000 to Amy Frost's father, who made the money available to the Frosts. The Frosts received this money, but Frost then claimed that D&Y's work was inferior and did not pay anything to D&Y. Royal claimed that he did not know why the Frosts had been turned down for a loan by the lot lender and did not ask.

On March 18, 2008, Royal informed deNourie and Yost that the bank could not loan money to the Frosts because the bank had purchased Frost's mortgage company and Frost was now the bank's employee. Yost said that this meeting was the first time Royal had notified D&Y that the bank would not

provide funding for the construction. deNourie said that D&Y did not learn about the bank's loan to Amy Frost's father until November 2008, when it took Royal's deposition.

In April 2008, D&Y sued the Frosts and the bank. At some point, the house was foreclosed. In December 2008, the Frosts filed for chapter 7 bankruptcy. D&Y sought a determination in bankruptcy court that the debt to it was nondischargable.[1] The bankruptcy court stayed that action pending the outcome of this litigation.

## 2. Procedural History

In 2011, the Frosts and the bank moved for summary judgment. The court granted the motions in part. The court determined that the Frosts had no duty to disclose their financial condition because D&Y had not asked for this information. It found that the Frosts made no misleading representations about their financial condition and that D&Y had instead assumed that they were solvent. It granted summary judgment to the Frosts on D&Y's fraud claim. Because it found no evidence of fraud, it concluded that the civil conspiracy claim against the Frosts failed. It further concluded that the conspiracy claim failed against the bank because D&Y had not specifically alleged a separate fraud claim against the bank. It granted summary judgment to the Frosts and the bank on the conspiracy claim. But it denied summary judgment on D&Y's equitable estoppel and promissory estoppel claims.

In April 2013, at the start of the bench trial, the Frosts confessed judgment for $245,000 on D&Y's breach of contract claim. After the trial, the court entered judgment against D&Y on its remaining claims of equitable and promissory estoppel.

## III. ASSIGNMENTS OF ERROR

D&Y assigns, reordered and somewhat reduced, that the court erred in (1) granting partial summary judgment to the defendants and failing to rule that the defendants did not meet their burden of proof for summary judgment; (2) failing

---

[1] See 11 U.S.C. § 523(a)(2) (2006).

to view the summary judgment evidence in the light most favorable to D&Y and to give it the benefit of all reasonable inferences; (3) failing to rule on D&Y's claims of fraudulent representations and promises at the summary judgment stage; (4) ruling that the Frosts had no duty to disclose their financial condition despite evidence that they did have this duty; (5) failing to rule on objections to evidence taken under advisement; (6) failing to find that D&Y's reliance on the bank's promise was reasonable and in good faith; (7) failing to find that D&Y had proved all the elements of its claims for promissory estoppel and equitable estoppel; and (8) failing to award D&Y $208,896.41, plus prejudgment interest.

## IV. STANDARD OF REVIEW

[1,2] We will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[2] In reviewing a summary judgment, we view the evidence in the light most favorable to the party against whom the judgment was granted, and give that party the benefit of all reasonable inferences deducible from the evidence.[3]

[3,4] Regarding the trial court's judgment after the bench trial on D&Y's equitable and promissory estoppel claims, the traditional distinction between legal and equitable claims remains relevant to our review of the court's judgment.[4] Although a party can raise estoppel claims in both legal and equitable actions, estoppel doctrines have their roots in equity.[5] In reviewing judgments and orders disposing of claims

---

[2] *SID No. 424 v. Tristar Mgmt.*, 288 Neb. 425, 850 N.W.2d 745 (2014).

[3] *Latzel v. Bartek*, 288 Neb. 1, 846 N.W.2d 153 (2014).

[4] See *Christiansen v. County of Douglas*, 288 Neb. 564, 849 N.W.2d 493 (2014).

[5] See, *D & S Realty v. Markel Ins. Co.*, 280 Neb. 567, 789 N.W.2d 1 (2010); *Rauscher v. City of Lincoln*, 269 Neb. 267, 691 N.W.2d 844 (2005); 1 Dan B. Dobbs, Dobbs Law of Remedies § 2.3(5) (2d ed. 1993); 28 Am. Jur. 2d *Estoppel and Waiver* §§ 1 and 34 (2011).

sounding in equity, we decide factual questions de novo on the record and reach independent conclusions on questions of fact and law.[6] But when credible evidence is in conflict on material issues of fact, we consider and may give weight to the fact the trial court observed the witnesses and accepted one version of the facts over another.[7]

## V. ANALYSIS

### 1. Court Incorrectly Granted the Defendants Summary Judgment on D&Y's Claims for Fraud and Civil Conspiracy

#### (a) Questions of Fact Precluded Summary Judgment for the Frosts on D&Y's Fraud Claim

In D&Y's fraud claim against the Frosts, it alleged that (1) they induced D&Y to enter the contract by falsely representing their ability to pay for D&Y's work and (2) they concealed that they were insolvent and lacked the resources to fulfill their obligations under the contract. As noted, the court found that the Frosts had no duty to disclose their financial condition because the facts show none of the triggering circumstances requiring disclosure of material facts under the Restatement (Second) of Torts § 551.[8]

[5] Under § 551 of the Restatement, which we have adopted,[9] a party to a business transaction can be liable to another party for failing to disclose a fact that he or she knows may justifiably induce the other to act or refrain from acting in the transaction. But a nondisclosing party can only be liable if it was under a duty to the other to exercise reasonable care to

---

[6] See, Neb. Rev. Stat. § 25-1925 (Reissue 2008); *Christiansen, supra* note 4; *American Family Mut. Ins. Co. v. Regent Ins. Co.*, 288 Neb. 25, 846 N.W.2d 170 (2014); *In re Estate of McKillip*, 284 Neb. 367, 820 N.W.2d 868 (2012).

[7] *Robertson v. Jacobs Cattle Co.*, 285 Neb. 859, 830 N.W.2d 191 (2013).

[8] Restatement (Second) of Torts § 551 (1977).

[9] See *Streeks v. Diamond Hill Farms*, 258 Neb. 581, 605 N.W.2d 110 (2000), *overruled in part on other grounds, Knights of Columbus Council 3152 v. KFS BD, Inc.*, 280 Neb. 904, 791 N.W.2d 317 (2010).

disclose the fact at issue.[10] Whether a duty to disclose exists is determined by all the circumstances, but § 551(2) sets out "several situations which have been consistently recognized as creating a duty to disclose."[11] The court found that none of these circumstances were present.

D&Y contends that the court erred because it overlooked D&Y's claims and evidence of fraudulent misrepresentations that induced it to enter into the contract. D&Y argues that its evidence showed there were genuine issues of fact whether the Frosts had falsely represented the following facts:

• The Frosts' first builder defaulted, and they had sued the builder (when the first builder had sued them for defaulting).
• No liens had been filed against the property (when contractors had filed liens against it).
• They had $200,000 from the original construction loan (when they had defaulted on this loan).
• They could easily obtain cash or financing for an additional $75,000 toward the contract price.

The Frosts counter that they had no duty to disclose their financial condition because they made no ambiguous or misleading statements about their finances. They also contend that whether they were insolvent was immaterial to the transaction because the construction was to be funded by third-party financing. Finally, they contend that D&Y did not rely on their statements.

But to support their nonreliance argument, the Frosts cherry-pick statements from deNourie's depositions. deNourie stated that he could not recall "specifics" about his conversations with Frost before the parties contracted for the work. And the Frosts point to Yost's deposition statement that he and deNourie had assumed the Frosts were solvent because Frost owned a mortgage company that was located in a building that he owned. We disagree that there were no genuine issues of fact regarding these issues.

---

[10] See *Zawaideh v. Nebraska Dept. of Health & Human Servs.*, 280 Neb. 997, 792 N.W.2d 484 (2011).

[11] See *Streeks, supra* note 9, 258 Neb. at 590, 605 N.W.2d at 118.

[6] Initially, we point out that in addition to alleging fraudulent concealment, D&Y alleged the Frosts made fraudulent misrepresentations. A fraudulent misrepresentation claim requires a plaintiff to establish the following elements: (1) A representation was made; (2) the representation was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff should rely on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result.[12]

[7] But misleading half-truths can also constitute fraud:

> When a party makes a partial or fragmentary statement that is materially misleading because of the party's failure to state additional or qualifying facts, the statement is fraudulent. "Fraudulent misrepresentations may consist of half-truths calculated to deceive, and a representation literally true is fraudulent if used to create an impression substantially false." "'To reveal some information on a subject triggers the duty to reveal all known material facts.'" Consistent with imposing liability for half-truths, the Restatement (Second) of Torts § 527 provides that an ambiguous statement is fraudulent if made with the intent that it be understood in its false sense or with reckless disregard as to how it will be understood.[13]

[8] We have recognized an overlap between fraudulent concealment and fraudulent misrepresentation claims. If a defendant's partial or ambiguous representation is materially misleading, then under § 551(2)(b) of the Restatement, the defendant has a duty to disclose known facts that are necessary to prevent the representation from being misleading.[14]

It is true that the record shows Yost admitted to making some assumptions about Frost's solvency based on the appearance of a successful mortgage business that he owned. The court apparently relied on Yost's statement in sustaining the Frosts'

---

[12] See *Knights of Columbus Council 3152*, *supra* note 9.

[13] *Id*. at 922-23, 791 N.W.2d at 331-32.

[14] See *Knights of Columbus Council 3152*, *supra* note 9.

motion for summary judgment. But the court erred in implicitly concluding that because of D&Y's assumptions, it could not have relied upon or been misled by Frost's positive statements of facts about the Frosts' ability to pay for D&Y's work. The Frosts' house had not been worked on for 1½ years when they asked D&Y to finish the construction. So a fact finder could reasonably conclude that deNourie and Yost would have been reluctant to contract for the work without some explanation for why the first builder stopped its work—even if they generally believed Frost ran a successful business. Under these circumstances, a fact finder could determine that deNourie and Yost's assumptions about Frost's solvency made them more likely to believe Frost's statements, while still finding that they had in fact relied on them.

[9] And we recognize that a party's mere silence about its financial condition cannot constitute a misrepresentation unless the other party asks for the information.[15] But here, the Frosts voluntarily made statements about their ability to pay for D&Y's work and they had to do so in a manner that was not false or materially misleading. Giving D&Y the benefit of all reasonable inferences, the record supports its claim that the Frosts made fraudulent misrepresentations or concealed material information that they had a duty to disclose.

In his deposition, deNourie stated that Frost had told him before executing the contract that no liens against the property existed. Yost testified that before entering the contract, Frost told him that he had sued the previous builder but that the litigation had been resolved and there were no liens against the property. Yost said that Frost told him that he had $200,000 left from the original construction loan and that he could easily obtain an additional $75,000 in cash or financing. Moreover, the contract itself stated that the original construction had stopped in December 2005 "due to builder default" and that the Frosts had arranged financing to complete the construction of their house.

---

[15] See, *Moyer v. Richardson Drug Co*., 70 Neb. 190, 97 N.W. 244 (1903); 37 Am. Jur. 2d *Fraud and Deceit* § 223 (2013).

So this is not a case in which a party to a contract promised to seek financing or was merely silent about its ability to fulfill its obligations. If a fact finder believed deNourie and Yost's evidence, then Frost represented that he had $200,000 left from a construction loan when he had defaulted on the first construction contract funded by the loan and been sued by the builder. And if the Frosts had defaulted on their original construction contract, a fact finder could conclude that the Frosts knew their ability to obtain further draws against the construction loan was likely compromised. So D&Y's evidence was sufficient to raise an issue of fact whether Frost knew his representation about funds being available from the original construction loan to pay for D&Y's work was false or materially misleading.

In some circumstances, Frost's statement that he could easily obtain cash or financing for an additional $75,000 toward the contract price would amount to an opinion of his abilities. But here, a fact finder could conclude that Frost knew his statement was false when made or made recklessly to induce D&Y's reliance on it without knowledge that it was true. The same facts that undermine his representation about funding availability from the original construction loan support an inference that the Frosts knew in April 2007 that they could not easily obtain cash or financing for an additional $75,000. The evidence supports a finding that the Frosts had defaulted on the original construction contract and that soon after D&Y's work began, the Frosts defaulted on required payments during construction. In sum, the court failed to consider whether a fact finder could conclude that Frost made intentionally false or misleading statements intended to dispel any concerns D&Y had about the unfinished construction and the Frosts' ability to pay for the work to induce D&Y to enter the contract.

[10,11] The Frosts also argue that D&Y failed to exercise reasonable diligence to ask for financial statements showing the Frosts' ability to pay for its work. But this argument assumes that the Frosts did not make fraudulent statements about their ability to pay for D&Y's work. If D&Y proves that they did, then the applicable rule is that the recipient of an

intentionally false statement of material fact may justifiably rely on the statement if the recipient would have to investigate to discover the truth.[16] It is true that under Nebraska law, the recipient of a representation must exercise ordinary prudence to ascertain its truth when the means of discovering the truth is in his or her hands.[17] But in claims of intentional misrepresentations, we have applied this rule only in limited circumstances: (1) when a property's defects would be obvious to a potential buyer upon inspection[18]; (2) when the seller of a business gave the buyer all the expense and sales records to a buyer to ascertain the accuracy of the seller's statements regarding profits, did not vouch for his estimates, and recommended that the buyer have his estimates independently evaluated, but the buyer failed to follow through[19]; and (3) when a plaintiff failed to read a legal agreement before signing it and had an opportunity to do so,[20] assuming that the plaintiff's execution of the contract was not induced by fraud.[21]

[12-14] And regarding intentional misrepresentations, we have explained that a plaintiff's contributory negligence is not a defense to such claims: "'[A] fraud-feasor will not be heard to assert that his victim was negligent in relying on the misrepresentation.'"[22] So, absent information that should put a recipient on notice that a representation may be false, a person may generally rely on the truth of another's representation.[23] In intentional misrepresentation cases, a plaintiff fails to exercise ordinary prudence only when the plaintiff's reliance is wholly

---

[16] See *Omaha Nat. Bank v. Maufacturers Life Ins. Co.*, 213 Neb. 873, 332 N.W.2d 196 (1983).

[17] See *Lucky 7 v. THT Realty*, 278 Neb. 997, 775 N.W.2d 671 (2009).

[18] See *id.*

[19] *Schuelke v. Wilson*, 250 Neb. 334, 549 N.W.2d 176 (1996).

[20] See *Omaha Nat. Bank, supra* note 16.

[21] See *Eicher v. Mid America Fin. Invest. Corp.*, 270 Neb. 370, 702 N.W.2d 792 (2005).

[22] See *Omaha Nat. Bank, supra* note 16, 213 Neb. at 884, 332 N.W.2d at 203, quoting *Kubeck v. Consolidated Underwriters*, 267 Or. 548, 517 P.2d 1039 (1974).

[23] *Id.*

unreasonable, given the facts open to the plaintiff's observation and his or her own skill and experience.[24] "[A] plaintiff '"may not close his eyes to what is obviously discoverable by him."'"[25]

But here, the truth of the facts presented by Frost's alleged false statements was not obvious. Discovering whether the first builder had defaulted, whether liens had been placed on the property, and whether $200,000 was still available from the construction loan money would have required an investigation. So, a fact finder could reasonably infer that the Frosts made intentionally false or misleading statements and that D&Y justifiably relied on them.

Finally, if a fact finder believed D&Y's evidence, he or she could conclude that Frost's alleged misrepresentations were material to the transaction. Yost testified that D&Y would not have entered the contract if it had known the first builder had sued the Frosts for defaulting on the contract. Obviously, if D&Y had known that the Frosts defaulted, it would have questioned whether the Frosts were in financial trouble and could obtain funding from the original construction loan or a new loan. Equally important, this information would have alerted D&Y that filing a lien if the Frosts defaulted might be futile. We conclude that the court erred in granting summary judgment to the Frosts on D&Y's fraud claim.

### (b) Questions of Fact Precluded Summary Judgment for the Frosts and the Bank on D&Y's Civil Conspiracy Claim

In D&Y's civil conspiracy claim, it alleged that Frost and the bank conspired to conceal that the Frosts were insolvent and could not pay their debts by assuring D&Y that funding was available to pay D&Y the amount of their lien. D&Y alleged that the bank, as part of the conspiracy, assured D&Y that funding for the full amount of D&Y's lien was available

---

[24] *Id.*

[25] *Lucky 7, supra* note 17, 278 Neb. at 1004, 775 N.W.2d at 676.

to the Frosts to pay D&Y for its work. It alleged that this deception benefited the bank by maximizing the returns the bank would receive on loans it had already made to the Frosts. It further alleged that the bank wanted to conceal from other creditors that the Frosts were insolvent and that the bank had already made loans to the Frosts or for their benefit that exceeded the bank's legal lending limit. The court granted summary judgment to both the Frosts and the bank on the conspiracy claim.

### (i) Court Erred in Granting Summary
### Judgment to the Frosts

Because the court had already determined that D&Y's fraud claim against the Frosts failed as a matter of law, it concluded that Frost could not have conspired to commit fraud. It granted the Frosts summary judgment on this claim.

D&Y contends that the court erred because D&Y's evidence established that after D&Y stopped work in October 2007, Frost and the bank were acting in concert. D&Y contends that the conspiracy occurred when Royal, on Frost's behalf, sent the December 10, 2007, e-mail to Frost to forward to D&Y and when Royal assured Yost in telephone conversations that the bank would finance the Frosts' construction and pay the amount of D&Y's lien directly to it. In addition, D&Y argues that the court failed to recognize that its fraud claim and civil conspiracy claim rested on two separate periods. That is, its second cause of action for fraud rested on facts showing the Frosts' alleged misrepresentations in April 2007, before the parties entered into the contract. But its third cause of action for civil conspiracy rested on facts that occurred in December 2007, after D&Y stopped work on the house in October. D&Y alleged that after D&Y stopped work, Frost and the bank conspired to make fraudulent misrepresentations that the Frosts had funding available to pay for D&Y's work to induce D&Y to *resume* work.

We agree with D&Y that the court incorrectly granted Frost summary judgment on D&Y's third cause of action because

it had determined that D&Y's second cause of action against the Frosts failed as a matter of law. First, we have determined that the court incorrectly granted summary judgment to the Frosts on D&Y's second cause of action for conduct occurring in April 2007. Second, even if its ruling had been proper, it would not have invalidated D&Y's claim that Frost colluded with Royal in December 2007 to make fraudulent misrepresentations about the availability of funding to induce D&Y to resume work.

### (ii) Court Erred in Granting Summary Judgment to the Bank

The court concluded that D&Y's conspiracy claim against the bank failed because a civil conspiracy claim depends on the existence of an underlying tort. Because D&Y did not allege a separate fraudulent concealment claim against the bank, the court concluded that D&Y could not maintain a conspiracy claim against the bank. We disagree.

[15,16] A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.[26] The gist of a civil conspiracy action is not the conspiracy charged, but the damages the plaintiff claims to have suffered due to the wrongful acts of the defendants.[27]

[17,18] A party does not have to prove a civil conspiracy by direct evidence of the acts charged. It may be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purpose to be accomplished. It is, however, necessary to prove the existence of at least an implied agreement to establish conspiracy.[28] Furthermore, a civil conspiracy is only actionable if the alleged conspirators actually committed some underlying misconduct.[29] That is, a conspiracy is not a separate and independent tort in itself;

---

[26] *Eicher, supra* note 21.

[27] *Id.*

[28] *Ashby v. State*, 279 Neb. 509, 779 N.W.2d 343 (2010).

[29] *Id.*

rather, it depends upon the existence of an underlying tort.[30] So without such underlying tort, there can be no cause of action for a conspiracy to commit the tort.

[19,20] As these rules illustrate, a claim of civil conspiracy requires the plaintiff to establish that the defendants had an expressed or implied agreement to commit an unlawful or oppressive act that constitutes a tort against the plaintiff. But we have never held that the plaintiff must plead the underlying tort of civil conspiracy as a separate claim against the defendants. To the contrary, in *Ashby v. State*,[31] we specifically looked to the plaintiff's allegations of the underlying tort in his conspiracy claim. The tort allegations were not set forth as a separate claim in the complaint, nor need they be.

[21,22] Nebraska is a notice pleading jurisdiction. Under our liberal pleading rules, a party is only required to set forth a short and plain statement of the claim showing that the pleader is entitled to relief.[32] A plaintiff's allegations are sufficient if they give the defendant fair notice of the claim to be defended against.[33] We conclude that D&Y met this requirement.

But the bank argues that the court's summary judgment order was correct because no evidence established that the bank conspired with the Frosts to conceal their insolvency in April 2007. This argument is irrelevant. As stated, the conspiracy claim allegations focused on conduct occurring in December 2007, after D&Y had stopped working in October. Finally, the bank argues that no evidence established the following facts: (1) The bank knew the Frosts were insolvent, (2) the bank assured D&Y that it would provide a loan for the construction, or (3) the bank agreed to conceal that it would not provide funding. But the court did not address these factual issues, and we decline to do so for the first time on appeal. We conclude only that the court erred in granting summary judgment for its stated reason.

---

[30] *Id.*

[31] *Id.*

[32] *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010).

[33] See *id.*

## 2. D&Y Has Not Shown That the Court Erred in Denying Its Claims for Equitable and Promissory Estoppel

As explained, after the court granted summary judgment to the Frosts and the bank on D&Y's fraud and civil conspiracy claims, it ruled in a bench trial for the defendants on D&Y's claims of equitable and promissory estoppel.

In D&Y's claim for equitable estoppel, it alleged that "[o]n or about December 10, 2007, [the bank] committed to paying D&Y $208,000 for completion of [the house]." It alleged that the bank's commitment was akin to a guarantee of the Frosts' payment of the contract and that the bank was estopped to deny the commitment. In its claim for promissory estoppel, D&Y alleged that it relied on Royal's written and oral representations in completing the contract. It alleged that the bank knew or should have known that D&Y would rely on its representations in providing its services.

In finding for the defendants on D&Y's equitable estoppel claim, the court concluded that D&Y had alleged it resumed and finished the work only because of Royal's representations in the December 10, 2007, e-mail. It stated that if D&Y had immediately resumed work, its reliance on the e-mail would have presented a closer case. But the court emphasized that Yost had called Royal on December 11, the day D&Y received the e-mail, and then asked Royal in an e-mail to confirm their alleged agreement over the telephone. The court recognized that the parties disputed whether Royal had orally committed to provide funding for the work. But it stated that "it is undisputed that Royal never responded to any of Yost's requests for a letter of assurance."

From these findings, the court determined that D&Y had not established by clear and convincing evidence that it had "relied in good faith on Royal's December 10, 2007 email." It noted that D&Y had not specifically alleged that it relied on a combination of the e-mail and later telephone calls with Royal. But the court concluded that this allegation would have failed because it found that D&Y had failed to establish by clear and

convincing evidence that Royal gave any assurances to Yost in telephone conversations.

In ruling against D&Y on its promissory estoppel claim, the court concluded that D&Y had not reasonably relied on the bank's alleged promise:

> A reasonable person in similar circumstances would not have resumed construction on the Property at issue one day after receiving no response to a request for a written letter of assurance. Furthermore, D&Y did not present evidence during trial establishing that it knew any of the answers to the questions in Yost's December 11, 2007 email regarding the method of payment of the alleged loan, to whom the funds would be paid, or the timing of payment prior to resuming construction. The Court finds that any reliance on [the bank's] alleged promise without answers to these critical questions would have been both unwise and unreasonable, particularly in this situation where D&Y was operating as a sophisticated business entity within the construction industry and was actively seeking to protect its financial interests after the Frosts had failed to pay for much of the work already completed.

### (a) D&Y Has Not Argued That the Court's Judgment on Its Equitable Estoppel Claim Was Incorrect

In D&Y's brief, it fails to explain why it believes the court erred in finding that it failed to prove its claim that the bank should be equitably estopped from denying it had committed to guaranteeing the Frosts' payment of the contract price. D&Y argues only that we try the issue de novo and that we should not defer to the court's reliance on Royal's deposition testimony because he did not appear at trial.

[23] As stated in the standard of review section, we agree that this claim is grounded in equity and that for such appeals, we decide factual questions de novo on the record. But to raise a factual question on appeal, D&Y must comply with our rules for appellate briefs. For an appellate court to consider an

alleged error, a party must specifically assign and argue it.[34] Although we conclude that the court's reasoning is relevant to D&Y's promissory estoppel claim, we decline to address its assignments of error related to equitable estoppel.

### (b) Court Did Not Err in Entering Judgment for the Defendants on D&Y's Promissory Estoppel Claim

Regarding the promissory estoppel judgment, D&Y argues that the undisputed evidence on its promissory estoppel claim showed that Yost asked Royal to send D&Y a confirmation letter of his oral promise and that Royal never complied. D&Y contends that the court erred in characterizing the requested letter as a "letter of assurance" and in concluding that these facts showed D&Y had not reasonably or in good faith relied on Royal's promise. D&Y argues that although it wanted the letter in order to get its subcontractors to work on the house again, D&Y itself reasonably relied on Royal's oral promise in a December 11, 2007, telephone conversation to fund the work. D&Y argues that a party's reliance on a promise is reasonable when it has no reason to know the truth or the means of discovering the truth with reasonable diligence. It contends that it did not know, and could not have discovered with reasonable diligence, that Royal's promises were untrue when made.

[24] A claim of promissory estoppel requires a plaintiff to show (1) a promise that the promisor should have reasonably expected to induce the plaintiff's action or forbearance, (2) the promise did in fact induce the plaintiff's action or forebearance, and (3) injustice can only be avoided by enforcing the promise.[35] Under Nebraska law, a plaintiff need not show a promise definite enough to constitute a unilateral contract, but

---

[34] See, *Rodehorst Bros. v. City of Norfolk Bd. of Adjustment*, 287 Neb. 779, 844 N.W.2d 755 (2014); *Curtis v. Giff*, 17 Neb. App. 149, 757 N.W.2d 139 (2008). See, also, See, Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2014).

[35] See, *Cass Cty. Bank v. Dana Partnership*, 275 Neb. 933, 750 N.W.2d 701 (2008); *Fast Ball Sports v. Metropolitan Entertainment*, 21 Neb. App. 1, 835 N.W.2d 782 (2013), citing *Rosnick v. Dinsmore*, 235 Neb. 738, 457 N.W.2d 793 (1990).

it must be definite enough to show that the promisee's reliance on it was reasonable and foreseeable.[36]

[25] We agree with D&Y that in an estoppel claim, a plaintiff generally fails to show that he or she reasonably and in good faith relied on the defendant's false statements or conduct if it knew or had reason to know that the misrepresentations were false when made or when it acted in reliance upon them.[37] Our case law is consistent with these cited authorities. We have held that a property owner did not rely in good faith on a zoning variance when the owner had learned that the variance faced a court challenge before beginning a construction project.[38]

Moreover, D&Y's reliance on Royal's promise to provide funding for the project would not be in bad faith just because the promise was oral.[39] And D&Y's evidence showed that it was relying on both Royal's December 10, 2007, e-mail and his alleged statements to clarify the e-mail in a December 11 telephone conversation with Yost. D&Y also presented evidence to show that Royal assured Yost that he would send a confirmation letter of the bank's oral promise and repeated these statements in later telephone calls. Under D&Y's version of events, until Royal informed D&Y that Frost was seeking a loan from the lot lender, D&Y would have had no reason to suspect that Royal's alleged promise to provide funding was false.

But we disagree with D&Y that all the facts relevant to its promissory estoppel claim were undisputed. In his deposition, Royal denied telling Yost that the bank would provide funding for D&Y's work. He could not recall speaking to Yost on December 11, 2007, when Yost claimed Royal orally promised

---

[36] See *Blinn v. Beatrice Community Hosp. & Health Ctr.*, 270 Neb. 809, 708 N.W.2d 235 (2006).

[37] See, *Heckler v. Community Health Services*, 467 U.S. 51, 104 S. Ct. 2218, 81 L. Ed. 2d 42 (1984), citing 3 John Norton Pomeroy, A Treatise on Equity Jurisprudence §§ 805, 810, and 812 (Spencer W. Symons ed., 5th ed. 1941); Restatement (Second) of Torts, *supra* note 8, § 541 and comment *a*.

[38] See *Bowman v. City of York*, 240 Neb. 201, 482 N.W.2d 537 (1992).

[39] See *Cass Cty. Bank, supra* note 35.

to provide the funding. And Royal said he told Yost that Frost had mentioned getting money from the lot lender. The district court specifically found that D&Y had failed to prove that Royal promised to fund D&Y's work.

We recognize that the court made this finding in deciding D&Y's equitable estoppel claim instead of its promissory estoppel claim. But we cannot ignore this finding, which is ostensibly incompatible with its conclusion that D&Y did not reasonably rely on Royal's alleged oral promises. The court's conclusion that D&Y did not rely in good faith on Royal's promise rests on an implicit assumption that a promise was made. We believe the court's order is consistent only if it is interpreted as concluding D&Y had failed to prove by clear and convincing evidence that Royal's oral statements were sufficiently definite to show a promise to fund D&Y's work that would reasonably and foreseeably induce its reliance. And we conclude there is support for this finding. But the court's judgment for the defendants on D&Y's estoppel claims does not preclude D&Y from attempting to prove—for its claims of fraud and civil conspiracy—that Royal made statements that foreseeably induced its reliance.

### 3. D&Y's Failure to Satisfy Clear and Convincing Standard of Proof Does Not Preclude Litigation of Same Issue Under a Lower Standard of Proof

[26-30] A plaintiff must establish each element of equitable estoppel by clear and convincing evidence.[40] The same standard of proof applies to a promissory estoppel claim resting on allegations of fraud. In claims for equitable relief, Nebraska law imposes a clear and convincing standard of proof for allegations of fraud.[41] But it does not impose a clear

---

[40] *Double K, Inc. v. Scottsdale Ins. Co.*, 245 Neb. 712, 515 N.W.2d 416 (1994); *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989).

[41] See, *Eggleston v. Kovacich*, 274 Neb. 579, 742 N.W.2d 471 (2007); *Schuelke v. Wilson*, 255 Neb. 726, 587 N.W.2d 369 (1998); *Kracl v. Loseke*, 236 Neb. 290, 461 N.W.2d 67 (1990); *Bock v. Bank of Bellevue*, 230 Neb. 908, 434 N.W.2d 310 (1989).

and convincing standard of proof for fraud claims in actions at law.[42] The standard of proof for fraudulent misrepresentation claims is proof by a preponderance of the evidence.[43] And issue preclusion does not apply to a party who had a higher standard of proof in the first action than the standard that applies in a later proceeding.[44]

## VI. CONCLUSION

We conclude that the court erred in granting summary judgments to the Frosts on D&Y's fraud claim and to the Frosts and the bank on D&Y's civil conspiracy claim. In its final judgment, we conclude that the court did not err in finding that D&Y failed to prove by clear and convincing evidence that Royal, the bank's president, made a promise to fund D&Y's work that was definite enough to induce D&Y's foreseeable reliance on the statement. But we conclude that this finding does not preclude D&Y from attempting to prove otherwise under the lower standard of proof that applies to its fraud claims. We reverse the court's summary judgment orders and remand the cause to the court to conduct further proceedings on D&Y's claims of fraud and civil conspiracy.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

STEPHAN, J., not participating.

---

[42] *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011).

[43] See *Four R Cattle Co. v. Mullins*, 253 Neb. 133, 570 N.W.2d 813 (1997).

[44] See, *In re Estate of Krumwiede*, 264 Neb. 378, 647 N.W.2d 625 (2002); *State v. Yelli*, 247 Neb. 785, 530 N.W.2d 250 (1995); Restatement (Second) of Judgments § 28(4) (1982).